## Case No. 15,048.

### UNITED STATES v. ELM.

[2 Cin. Law Bul. 307; 23 Int. Rev. Rec. 419.]

District Court, N. D. New York. Dec. 24, 1877.

CITIZENSHIP OF INDIANS—DISINTEGRATED TRIBES
—RIGHT TO VOTE.

[Indians born in the United States, of a tribe which has ceased to maintain its tribal integrity, and who are subject to taxation under the laws of the state in which they reside, are "subject to the jurisdiction" of the United States, within the meaning of the fourteenth amendment to the constitution, and are therefore, under its terms, citizens of the United States, and of the state of their residence, and possess the right to vote in national elections.]

[Cited in Elk v. Wilkins, 112 U. S. 120, 5 Sup. Ct. 48, 55.]

[This was an indictment against Abraham Elm, an Oneida Indian, for illegal voting. Heard on motion for a new trial.]

WALLACE, District Judge. The defendant, an Oneida Indian, who was born and had always resided within the town of Lenox, Madison county, voted for representative in congress at the election of 1876, claiming to be a citizen of the United States. He was indicted for illegal voting, tried, and convicted in this court. Sentence was suspended by the court in order that the questions presented on the trial, and which were then formally ruled against the defendant, might be deliberately considered and decided upon a motion for a new trial. That motion has been made, and the question is now presented whether or not the Oneida Indians are citizens of the United States, and, as such, entitled to vote.

If the defendant was a citizen of the United States, he was entitled to exercise the right of suffrage. The right to vote is conferred by the state, not by the United States, and it has been conferred in New York upon "every male citizen of the age of twenty-one years who shall have been a citizen for ten days and an inhabitant of this state one year next preceding an election, and for the last four months a resident of the county, and for the last twenty days a resident of the election district in which he may offer his vote." By the fourteenth amendment to the constitution it is declared that "all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside," and by force of this language every citizen of the United States is a citizen of the state wherein he resides. It is not enough to confer citizenship on the defendant that he was born in the United States. It must also appear that he was "subject to the jurisdiction thereof," within the meaning of the fourteenth amendment.

In a general sense every person born in the United States is within the jurisdiction thereof while he remains in the country. Aliens, while residing here, owe a local allegiance, and are equally bound with citizens to obey all general laws for the maintenance of peace and order which do not relate specially to our own citizens, and they are amenable to the ordinary tribunals of the country. But there are classes of residents who, though they may be born here, are not subject to the exercise of those prerogatives of sovereignty which a government has the right to enforce over its own citizens, and over them alone, and it is to these that the language of the amendment applies. Within this sense those persons who, though born here, are born within the allegiance of a foreign sovereign, or of another government, are not subject to the jurisdiction of the United States. The children of ambassadors, though in fact born here, are, in the theory of the law, born within the allegiance of the foreign power the parent represents.

Indians who maintain their tribal relations are the subjects of independent governments, and, as such, not in the jurisdiction of the United States, within the meaning of the amendment, because the Indian nations have always been regarded as distinct political communities, between which and our government certain international relations were to be maintained. These relations are established by treaties to the same extent as with foreign powers. They are treated as

sovereign communities, possessing and exercising the right of free deliberation and action, but, in consideration of protection, owing a qualified subjection to the United States.

If defendant's tribe continued to maintain its tribal integrity, and he continued to recognize his tribal relations, his status as a citizen would not be affected by the fourteenth amendment; but such is not his case. His tribe has ceased to maintain its tribal integrity, and he has abandoned his tribal relations, as will hereafter appear; and because of these facts, and because Indians in this state are subject to taxation, he is a citizen, within the meaning of the fourteenth amendment. This conclusion is sanctioned not only by the language of the fourteenth amendment, but is fortified by other legislation by congress concerning citizenship.

By Act Cong. 1866, c. 31 [14 Stat. 27], commonly known as the "Civil Rights Bill," all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States. Native Indians in this state are taxed. By an act of the legislature passed in 1843, native Indians are authorized to purchase, take, hold, and convey real estate, and, when they become freeholders to the value of $100, "are subject to taxation and to the civil jurisdiction of courts of law and equity in the same manner and to the same extent as citizens." When by the civil rights bill Indians not taxed were excluded from the classes upon which citizenship was conferred, upon well-settled rules of construction those who were taxed were by implication included in the grant. In other words, those Indians who were taxed were not excepted from the class who were declared to be citizens.

Previous to the adoption of the fourteenth amendment, it had been held by high authority that congress might naturalize Indians by special act (7 Op. Attys. Gen. 746); and, of course, if this could be done by special act, it could by a general law, and the act in question would confer citizenship on the defendant. No doubt can be entertained of the power of congress to declare what persons shall be recognized as citizens of the United States, and when, by the fourteenth amendment, such citizens were declared to be citizens of the several states in which they should reside, the whole subject of citizenship was transferred to the jurisdiction of congress, and the rights of the defendant could safely rest upon the act in question. It is not necessary, however, to decide that the Indians in this state became citizens by force of the civil rights bill. I prefer to regard that act as a contemporaneous construction of the meaning of the fourteenth amendment. The civil rights bill was passed by the same congress which adopted the resolution to submit the fourteenth amendment to the legislatures of the several states. Both the amendment and the civil rights bill dealt with the question of citizenship, and in the declaration defining the class of persons to whom it was extended language almost identical was used in each. While, primarily, these measures, originated for the protection of natives of African descent, who, by the decision in the case of Scott v. Sandford, 19 How. [60 U. S.] 393, were held not to be citizens of the United States, within the meaning of the constitution, it is not to be doubted that they were intended to confer the rights of citizenship upon such others as, owing to the peculiar condition of our national development, were not citizens in legal contemplation, though by birth and by allegiance they were or might become entitled to recognition as such.

The phraseology employed is sufficiently broad to include Indians who have abandoned their tribes and become so far integrated with the general body of citizens that the states in which they reside have subjected them to the duties of citizens and enforced over them the prerogatives of sovereignty. Prior to the adoption of the fourteenth amendment, many of the Indian tribes had become disintegrated, and the members had abandoned their tribal relations, and were distributed among and assimilated with the general body of citizens of the state in which they lived, conforming to the same usages, and their rights of person and property regulated by the same laws, which controlled the rest of the inhabitants of the state. They were natives by birth, and were not aliens in allegiance. Their status had been defined, sometimes, as that of alien residents; sometimes, as that of domestic subjects. In the case of Scott v. Sandford, 19 How. [60 U. S.] 404, Chief Justice Taney said: "If an individual Indian should leave his tribe, and take up his abode among the white population, he would be entitled to all the rights and privileges which would belong to an emigrant from any other foreign people." Accepting this as a correct statement of the law, it would follow that such an Indian was not, and in the absence of special legislation could not become, a citizen. He could not be naturalized, because the naturalization laws only apply to persons born out of the United States. The remarks of Chief Justice Taney were applicable to that class of Indians who had left their tribes, and thus abandoned their tribal relations: but instances were extant, in the history of the Indians tribes, where the tribal organization had become defunct, and where the individual Indians had so far been recognized as citizens of the state that they had been authorized to acquire and hold real estate, and subjected to taxation and to the civil jurisdiction of the courts. It had never been authoritatively decided whether or not such Indians were citizens.

In 1822 the supreme court of this state decided, in Jackson v. Goodell, 20 Johns. 187, that the Indians resident in this state were citizens, but that decision was reversed by the court of errors. Since that decision, however, great changes have taken place in the social and political relations between the Indians and the body of citizens at large, as is well illustrated by the history of the Oneidas. By treaties between the United States and the Six Nations, the Menomonies, and Winnebagoes in 1831 and 1838 the Six Nations acquired extensive cessions of lands in Wisconsin near Green Bay; and about that time the main body of the Oneidas removed to these lands. Since then, the tribal government has ceased as to those who remained in this state. It is true those remaining here have continued to designate one of their number as chief, but his sole authority consists in representing them in the receipt of an annuity which he distributes among the survivors. The 20 families which constitute the remnant of the Oneidas reside in the vicinity of their original reservation. They do not constitute a community by themselves, but their dwellings are interspersed with the habitations of the whites. In religion, in customs, in language, in everything but the color of their skins, they are identified with the rest of the population. In 1843, by an act of the legislature of this state, they were authorized to hold their lands in severalty, according to a partition which had theretofore been made. Reference has already been made to the general law of this state, passed in 1843, subjecting them to taxation and to the jurisdiction of the courts in the same manner and to the same extent as other citizens. In view of the changes which have intervened in the social and political relations of the Indians of this state since the decision of Jackson v. Goodell, there is certainly fair reasons to assume that, irrespective of the fourteenth amendment, they would now be held to be citizens of the state. However that might be, those who, like the defendant, have no tribe, and are taxed, are, within the language of the fourteenth amendment, subject to the jurisdiction of the United States, as that language should be interpreted in the light of the civil rights bill. They are natives, they owe no allegiance other than to the government of the United States, and they have been placed by the state upon an equality with its citizens respecting important rights denied to aliens. As the state and the United States can impose upon them all the duties and obligations of subjects, they are entitled to the corresponding rights which spring from relation. These are the rights which a government owes to its citizens.

For these reasons, my conclusion is the defendant was entitled to vote, and was improperly convicted. The motion for a new trial is granted.