### UNITED STATES v. BOYLAN et al.

(Circuit Court of Appeals, Second Circuit. March 3, 1920.)

No. 167.

1. **Indians ☞27(1)—United States may maintain action on behalf of Oneida Tribe in New York.**

The Oneida Indians remaining in New York and occupying the land reserved to them by the treaty with the state of 1842 constitute a distinct tribe or nation, and exclusive jurisdiction over them is vested in the federal government, which may maintain actions in this behalf.

2. **Indians ☞2, 15(1)—Tribal status may be terminated only by Congress.**

It is only where Congress has enacted legislation controlling the disposition of property on Indian reservations that valid conveyances may be made, and it is for Congress to say when the tribal status of Indians shall be deemed to have terminated.

3. **Indians ☞15(1)—Mortgage of interest in tribal lands by Oneida Indian void.**

In the absence of federal legislation authorizing it, a mortgage executed by a member of the Oneida Tribe of Indians in New York on his interest in the tribal lands *held* invalid, and a decree of a state court foreclosing it and making partition of the lands *held* null and void.

Ward, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Northern District of New York.

Action by the United States against Julia Boylan and Anne Silver Moyer. Judgment for the United States, and defendants bring error. Affirmed.

For opinion below, see 256 Fed. 468.

Joseph Beal, of Oneida, N. Y. (William F. Santry and W. W. Wilcox, both of Oneida, N. Y., of counsel), for plaintiffs in error.

D. B. Lucey, U. S. Atty. (Frank J. Cregg, Asst. U. S. Atty., of counsel), for the United States.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The United States government instituted this action for the purpose of ejecting the defendants below from 32 acres of land situated in the city of Oneida, Madison county, N. Y. The action is brought on behalf of certain Oneida Indians, under the claim that they are the wards of the federal government, and that the government has legal capacity to intervene in their behalf and eject from the said premises the defendants below, who claim title. Their title depends upon the following alleged conveyances:

On April 1, 1885, several deeds of conveyance were made by some of the original twenty-three Indians mentioned in the treaty of 1842 made by the state of New York with the Oneida Indians. Isaac Honyost, a descendant of Margaret Charles, mentioned as one of the tribe in the treaty of 1842, gave Philander Spalding a mortgage to secure the payment of $1,250 on a portion of the premises here in question. This mortgage was recorded April 2, 1888. On April 4, 1888, it was assigned by Spalding to Patrick Boylan and duly recorded. Shortly prior to July 3, 1897, Patrick Boylan died leaving a last will and testament, which was duly probated on July 8, 1897, and letters testamentary were issued to Joseph Beal, his sole executor named in the will. He duly qualified. The will gave the mortgage to Boylan's wife. In March, 1905, the executor commenced a statutory foreclosure of said mortgage by advertisement and, in addition, publishing and posting a copy of the notice of the sale at the office of the Hotel Brunswick at Oneida, N. Y. This notice was served on some of the Oneida Indians, but not all. The affidavits in that proceeding do not disclose who was then in occupation of the premises. The names of the persons served are given, but their relationship to the tribe is not clear. The sale actually took place on July 15, 1905, and the property was sold for $1,250 on the bid of Michael Burke of Oneida, N. Y. On August 29, 1905, Burke and his wife conveyed the premises by quitclaim deed to the defendant below, Julia Boylan. Philander Spalding and wife conveyed the same premises on July 10, 1906, by quitclaim deed, to Julia Boylan.

Julia Boylan commenced an action in the Supreme Court of the state of New York for the partition of the property here in question, and this by filing the summons and complaint and notice of pendency of action. In this proceeding Mary George, Noah George, Henry George, Maggie, wife of Henry George, William Honyost, Mrs. William Honyost, wife of William Honyost, and Isaac Honyost, were made defendants. Chapman Schenandoah and his wife were subsequently made parties. The defendants entered an appearance through their attorneys. Such proceedings were taken that a partition of said property was had, the interests of the various defendants were determined and fixed, and the report of the referee appointed was rejected by the Supreme Court justice when the proceedings reached him on a motion for confirmation. This, however, was subsequently reversed by the Appellate Division of the Supreme Court of the state, and a final judgment was entered confirming the same, and the referee was directed to execute to the purchaser a conveyance of the property sold. Boylan v. George, 133 App. Div. 514, 117 N. Y. Supp. 573. After deducting the costs and allowances incident to this litigation, and awarding to the plaintiff such moneys as she was entitled to in those proceedings, a deficiency judgment was awarded against the defendants for $6.05. Thus the interest of the Oneida Indians in this property was alleged to be extinguished. At the time these proceedings took place, the Oneida Indians were in possession and occupied them until they were ejected through the proceedings in the Supreme Court. By virtue of a writ of assistance, issued by that court, they

were forcefully ejected and removed against their protest. The referee appointed in the state Supreme Court, partitioned the property as follows:

(1) That Julia Boylan was seized and entitled in fee simple to an undivided thirty-one fortieths of same. Her title, if any, came through such statutory foreclosure and quitclaim deeds mentioned.

(2) Mary George was seized and entitled in fee simple to an undivided three-fortieths of same.

(3) Henry George was seized and entitled in fee simple to an undivided one-fortieth of same, subject to the inchoate right of dower of his wife, Maggie George.

(4) That William Honyost was seized and entitled in fee simple to an undivided one-fortieth of same, subject to the inchoate dower right of his wife.

(5) That Chapman Schenandoah was entitled to an undivided four-fortieths of same, subject to the inchoate right of dower of his wife.

(6) That Isaac Honyost had no interest therein.

In the proceedings to partition the property, neither the United States, nor the state of New York, nor the Commissioner of Indian Affairs, nor the Oneida Indians were made parties to the suit. The lower court has found as a fact that the Oneida Tribe of Indians were actually in possession and occupation of the lands in question, together with the adjoining lands, which form a part of the original Oneida Indian reservation. In May, 1842, a treaty was made between the first and second Christian parties of the Oneida Indians and the state of New York. At this time the lands in question, together with the other adjoining lands, were set apart by this treaty to the Oneida Indians then remaining on the reservation. It is on behalf of these Indians that this action is brought. The Oneida Indians were natives of the soil lying within the limits of the state of New York when it was organized. In 1784 the United States government entered into a treaty (7 Stat. 44) with the Six Nations of Indians residing within the state of New York, and one of these was the Oneidas. That treaty provided in article 2:

"The United States acknowledge the lands reserved to the [Indians] * * * in their respective treaties with the state of New York, and called their reservation, to be their property, and the United States will never claim the same, nor disturb them * * * nor their Indian friends residing thereon and united with them in the free use and enjoyment thereof; but the said reservation shall remain theirs until they choose to sell the same to the people of the United States, who have the right to purchase."

Some of the Indians moved from the reservation in New York state to Green Bay, Wis. These immigrations took place in 1840 and 1841, under the regulations and supervision of the federal government. The right was given to the Indians as a tribe to dispose of their lands in the state of New York, if they decided to move to Green Bay and there accept other lands allotted to them. After this, the Indians remaining held a single and undivided tract reserved out of the original Oneida reservation. It was in 1842, when the commissioners of the land office of the state of New York, then constituting the Indian department of the state, arranged that the state purchase such portion of the reservation as represented the equitable share in the proportion to the number of Indians who migrated in

1842 to Green Bay, Wis. The result of this was the treaty of 1842, herein referred to, in which all of the remaining Indians joined. Some 1,110 acres were surveyed and divided into 19 lots. Article 1 of the treaty provided as follows: That the Oneidas—

"do hereby grant, bargain, sell, cede, and surrender to the people of the state of New York, all the right, title, estate, and interest of the said party of the first part in and to all that part of their reservation not heretofore released by said party of the first part to the party of the second part, known and distinguished as lots numbered 1, 3, 4, 5, 7, 10, and 15 by Nathan Burchard's map and certificates of survey, containing 371.34 acres."

Articles 2 to 5, inclusive, provide for sales of such lands so ceded, and for payments to the Indians named in Schedule A, known as "Emigrating Party." Article 6 provided:

"It is hereby stipulated and agreed that those members of the first and second Christian parties of the Oneida Indians as are included in Schedule A hereby release, quitclaim and forever renounce to the said Indians named in Schedule B and to those who may succeed them in their right, title and interest, claim or demand, whatsoever in and to the said portion of land so set apart, described, reserved and allotted for those of the first and second Christian parties of said Indians who do not at present intend to migrate, enrolled in Schedule B as aforesaid, all and the residue of the said reservation not now nor heretofore ceded to the people of the said state, known and distinguished as lots numbered two, six, eight, nine, eleven, twelve, thirteen, fourteen, sixteen, seventeen, eighteen and nineteen as surveyed and allotted by Nathan Burchard. Reference is here had to the said map and field book of the said Nathan Burchard, and to be filed in the offices of the secretary of state and surveyor general; when copies thereof are indorsed thereon and duly authenticated by him, they shall for ever be deemed the metes and bounds of the lands ceded and those reserved. And those reserved shall be deemed the common property of all the individuals included in Schedule B."

Article 7 provided that the Indians should surrender the lands, and, if they belong to those named in Schedule A, such Indians should, on payment, immediately migrate and go beyond New York; but, if they belonged to Schedule B, then such persons were given possession of the lands so ceded. Thus the Indians in the reservation were divided into two classes. The lots numbered seventeen and nineteen, which are involved in this litigation, came under Schedule B. Schedule B gave the names of the "tenants in common and owners of lots 17 and 19," and these did not migrate. The following are those named as tenants in common and owners:

"Aaron Cooper, Hannah Cooper, Dolly Cooper, Margaret Cooper, Susan Cooper, Betsy Cooper, Jenney Cooper, Moses Cooper, Moses Charles, Caty Charles, Margaret Charles, Susan Charles, Mary Charles, Elizabeth Cornelius, Daniel Cornelius, Roderic Cornelius, Jenney Cornelius Job, alias Anthony Antone, Cornelius Antone, Thomas Antone, Mary Antone, Mary Antone, and Susan Antone."

No specific lot or parcel was attempted to be allotted or set off by the treaty to any individual Indian as his or her separate share. Under article 6 of the treaty, the migrating party, referred to in Schedule A, quitclaimed and renounced to the home party, named in Schedule B, and to those who might succeed them in interest, all of the rights in the lots reserved to them. The treaty provides for the succession in interest of their successors, and not "heirs and assigns."

Both parties named in the treaty joined in ceding said lands, which were to be sold by the state and the proceeds of which were to go to the migrating party. There is nothing in the treaty which indicates a partition of lands embraced in lots 17 and 19 as between the 23 individual Indians, nor did the treaty mention or contemplate any future partition between individuals. The state Constitution (article 1, section 15) provides that no purchase or contract of sale of land in this state made with the Indians shall be valid, unless made under the authority and with the consent of the Legislature. This was attempted by the state Legislature. Chapter 185, Laws 1843. That enactment provides as follows:

"Section 1. The Oneida Indians owning lands in the counties of Oneida and Madison are hereby authorized to hold their lands in severalty in conformity to the surveys, partitions and schedules annexed to and accompanying the treaties made with the said Indians by the people of this state in the year one thousand eight hundred and forty-two and now on file in the office of the secretary of state, and the lots so partitioned and designated by said survey to said Indians shall be deemed to be in lieu of all claims and interest of the said Indians in and to all other lands and property in the Oneida reservation. * * *

"Sec. 2. The Governor shall appoint a superintendent of the Oneida Indians. * * *

"Sec. 3. It shall be lawful for the said superintendent of the Oneida Indians, upon application made to him for that purpose, by any Indian or Indians owning lands as aforesaid, to sell and convey such lands to the person or persons so applying. * * * A deed of an Indian shall be valid to convey the title of himself, his wife and minor children, and every deed executed by virtue of this act shall be acknowledged by the grantor before the first judge of Madison county, and the consent of the superintendent shall be indorsed thereon, and when so executed and acknowledged and certified, shall be recorded in the county in which said land shall lie, with the same effect as other deeds.

"Sec. 5. The said superintendent shall, with the consent of a majority of the chiefs and head men of the said Indians, sell and convey the above mentioned lots of land, held according to Indian usages, and sanctioned by treaties with them on the part of this state, as the common property of all the Oneidas who did not cede their lands to the people of this state previous to the treaty made with them, March 8, 1841, for a fair price unto any purchaser or purchasers, by requiring from them cash payments. And the conveyances shall be made, executed, and acknowledged by the state superintendent; and the consent of the chiefs and head men in council shall also be acknowledged in the presence of an officer duly qualified to take acknowledgments of deeds. * * *

"Sec. 6. The deeds and conveyances made as aforesaid shall convey all the right, title and interest of the said Indians or Indian whose lands shall have been conveyed as aforesaid of, in and to the same, and shall vest in the purchaser or purchasers, his or their heirs and assigns, forever, an absolute estate of inheritance in fee simple."

Later the state Legislature passed an act (chapter 420 of the Laws of 1849), for the benefit of Indians, by the terms of which it was provided, among other things, that as to all tribes or bands of Indians who occupied Indian reservations within the state or hold lands therein as a common property, such tribes or bands may, by the acts of their respective Indian governments, divide such common lands into tracts or lots and distribute or partition the same in parts thereof, quantity and quality relatively considered, to and amongst the indi-

viduals or families of such tribes or bands, respectively, so that the same may be held in severalty and in fee simple, according to the laws of the state; but no lands occupied and improved by any Indian according to the laws, usage, or custom of the nation shall be set off to any person other than the occupant or his or her family. It was further provided that, in the event of distribution or partition, the deeds to be made to effect the same shall be made by such officers or commissioners as the government shall appoint and the commissioners of the land office shall approve, but, before any such deeds be executed, the proceedings and acts authorizing such execution and appointing the parties so to do, shall be authenticated and approved before and to the satisfaction of the county judge in the county in which the land to be conveyed shall lie, and be recorded in the clerk's office of the county. It was further provided that every deed which shall be executed under such authority shall be acknowledged before the county judge by the parties who executed it, and such judge shall examine the deeds and see that they be in due form and in pursuance of the authority under which they be executed, and indorse on such deed his certificate of such examination, and acknowledgment of such certificate shall authorize the county clerk to record such deeds in the records of the deeds of the county. It was further provided that no lands thus distributed and partitioned should be alienable by the grantee thereof, or his heirs, and such grantee, for 20 years after the date of the recording of the deed thereof, but they may be partitioned amongst the heirs of any grantee who shall die, and the same shall not be subject to any lien or incumbrance by way of a mortgage, judgment, or otherwise.

This enactment attempted to provide the manner and mode of partitioning the lands of Indians, with a view of safeguarding such conveyance, and guarded against the same being subject to any lien or incumbrance by way of any mortgage or otherwise. The Indian law of the state provided this. Birdseye's Revised Statutes, vol. 2, pp. 1408, 1409 (published 1896). This record indicates clearly that these requirements of the state statute of 1849 were not followed with reference to the deeds to the property here in question.

The state subsequently, by chapter 45, Laws of 1857, § 4, prohibited taxation of Indian reservation lands so long as the lands remain the property of the tribe or band occupying the same. Likewise the state made it a misdemeanor for a person to purchase or to attempt to purchase lands from any Indian, or claiming title thereto, without authority and consent of the Legislature (section 384a, Penal Code of New York). Thus it is admitted by the state that the Indian lands within the state are exempt from the state jurisdiction, at least so far as taxation is concerned. The record title does not disclose any deed or attempt to make a deed whereby all of the twenty-three Indians mentioned in the treaty of 1842 ever conveyed or attempted to convey to any one their interest in the property. Some of the twenty-three did attempt to make such conveyance by deeds. No partition was ever made of lots 17 and 19 by the tribe or band of Indians, as required by chapter 420, Laws of 1849. Congress has in no way approved or con-

sented to a partition or other disposition of the lands in question. But here, where an attempt was made to convey an interest of any of the Indians referred to since 1849, the provisions of the act have not been complied with; that is, the requirement for certification by the county judge of the county of the conveyance made by the Indians. The record discloses that between twenty-three and thirty-five Indians hold and enjoy the land here in question from the date of the treaty with the United States government in 1749 down to the time of the eviction above referred to.

[1] The first question presented is the right of the United States to maintain this action. The trial judge has found that the Oneida Indians were a distinct people, tribe, or band. With this finding we agree. The record does not disclose, as contended for by the defendants below, that the people have been completely incorporated with us and clothed with all the rights and bound by all the duties and obligations of the state of New York. Since the Indians exist as a separate band or tribe, and therefore as a separate nation, the exclusive jurisdiction over the Indians is in the federal government, and the right to maintain an action in their behalf under the federal Constitution is solely vested in the federal government. Heckman v. U. S., 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820. The highest court of the state of New York has recognized this jurisdiction. Seneca Nation of Indians v. Christie, 126 N. Y. 122, 27 N. E. 275.

[2] It is only where Congress has enacted legislation controlling the disposition of property of Indian reservations that valid conveyances may be made. In this way the restrictions imposed upon the sale of such lands are removed by the act of Congress. U. S. v. Waller, 243 U. S. 452, 37 Sup. Ct. 430, 61 L. Ed. 843. Congress alone has the right to say when the guardianship over the Indians may cease. U. S. v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192; Tiger v. Western Inv. Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. Accordingly it has been held that it is for Congress to say when the tribal existence shall be deemed to have terminated, and Congress must so express its intent in relation thereto in clear terms. Until such legislation by Congress, even a grant of citizenship does not terminate the tribal status or relieve the Indian from the guardianship of the government. U. S. v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192. The highest court of the state of New York has recognized that the federal government has never relinquished its suzerainty over the Indians of New York, even though the state of New York has legislated, granting powers to the Indians to regulate their own affairs and to protect their lands from invasion. People ex rel. Cusick v. Daly, 212 N. Y. 183, 105 N. E. 1048, Ann. Cas. 1915D, 367. The federal government made various treaties with the Six Nations of Indians in the state of New York, one as early as 1784, and again in 1789 and 1794. Later, in 1838, another treaty was entered into relating to their lands, and again in 1842. It appears that Congress provides funds for their support under various treaties and appropriations. See Annual Reports of U. S. Comm. of Indian Af-

fairs, Dept. of Interior. The Court of Appeals said in People ex rel. Cusick v. Daly, supra:

"Under our dual form of government, in which there are two distinct sovereignties, federal and state, each is supreme within its appropriate sphere. They exercise their respective powers in the same territory, each being independent of the other, and each having its separate executive, legislative, and judicial departments. This division of government, while simple in theory, frequently presents practical complexities which it is difficult to harmonize. One of our most troublesome problems has arisen over the status of the Indians in our political economy. They were the original occupants of our soil, and we have treated them as semi-independent nations, subject in some degree to both state and federal laws. Although greatly diminished in numbers, and restricted to reservations which are insignificant remnants of their former hunting grounds, they have maintained their tribal relations and customs, according to which they are to some extent permitted to govern their own affairs. Yet they are not citizens, either of the United States or of this state. The problem is further complicated by the fact that the history of some of the tribes within our own state differs widely from that of other tribes in other sections of the country." 212 N. Y. 191, 105 N. E. 1050, Ann. Cas. 1915D, 367.

The Supreme Court, in Fellows v. Blacksmith, 19 How. 366, 15 L. Ed. 684, referred to the New York Indians as wards of the nation, and that court held that they could not be removed from their lands in New York state by the state courts, but that the power resided solely in the federal government. In an early case (Samuel A. Worcester v. State of Georgia, 6 Pet. 515, 8 L. Ed. 483) it was held that the state of Georgia, one of the original 13 colonies, could not enforce an act for the punishment of persons on the Cherokee reservation, where the provisions of the statute in question were in conflict with the treaty between the Cherokee Nation and the federal government. There the court clearly recognized that the Indian tribes, irrespective of their locality, were under the protection of the federal government. The Supreme Court held in the Case of The New York Indians, 5 Wall. 761, 18 L. Ed. 708, that the treaties entered into between the Indians and the government prevented the state from taxing such lands, and this because of the guaranty of tribal rights of the Indians by the various treaties of the United States. In United States v. Sandoval, 231 U. S. 28, 34 Sup. Ct. 1, 58 L. Ed. 107, the court said:

"Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long-continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state." 231 U. S. 45, 46, 34 Sup. Ct. 5, 58 L. Ed. 107.

And in United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228, the court said:

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United

States, because it has never been denied, and because it alone can enforce its laws on all the tribes." 118 U. S. 384, 6 Sup. Ct. 1114, 30 L. Ed. 228.

It will thus be observed that not only has the United States government the sole power to act as the guardian of the Indians of the state whose tribal relation still exists, but it has the sole power to legislate as to the distribution of their lands. Such Indian tribes or bands occupying lands in reservations have always been treated as alien nations. The Indians individually were aliens; neither as nations nor as individuals did they own any allegiance to the European governments. Cherokee Nation v. State of Georgia, 5 Pet. 1, 8 L. Ed. 25. The right of self-government has never been taken from them. It has never been questioned, and no attempt made at subjecting them as a people, and it has always been considered and recognized by the states as a right of the federal government to make provisions for the disposition of their lands, and until such was made by the federal government the right of occupancy remained in the Indians. Worcester v. State of Georgia, 6 Pet. 515, 8 L. Ed. 483. While the state has a right to make treaties with the Indians, it cannot interfere with the right and obligation of the federal government. The federal government cannot deprive the state of those governmental powers which are part of its inherent right. De Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642.

[3] At all times the rights which belong to self-government have been recognized as vested in these Indians. Their right of occupancy has never been questioned, but the fee in the soil is in the state. This is a right of ultimate domain, with the right of present possession in the Indians. Congress has never legislated so as to permit title to pass from the Indians to the lots of land here in question. A transfer of the allotment to aliens is not simply a violation of the proprietary rights of the Indians; it violates the government rights of the United States.

" 'If these Indians may be divested of their lands, they will be thrown back upon the nation a pauperized, discontented, and possibly belligerent people.' The authority to enforce restrictions of this character is the necessary complement of the power to impose them." Heckman v. United States, 224 U. S. at page 438, 32 Sup. Ct. at page 432, 56 L. Ed. 820.

Our attention is not called to any act of Congress which permitted the Oneida Indians the right to hold the lands of that reservation in severalty or to mortgage or incumber them, nor that the state has conferred any such power, except as above referred to, which places restrictions and points out the method and manner of so doing. There is no authority which will enable one member of the tribe to sell and convey his interest in the reservation to an outsider, and to confer upon such purchaser the right to partition and sell in partition the lands held by several of the tribe in common. No law sanctions the sale of such lands so owned and held in a partition action brought by any person. Section 2116, chapter 3, of the Revised Statutes of the United States, relates to sales by Indians of their lands. It provides:

"That no purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any

validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." Comp. St. § 4100.

A tribe could not sell, nor could the individual members, for they have not an undivided interest in tribal lands, nor alienable interest in any particular tract. Franklin v. Lynch, 233 U. S. 269, 34 Sup. Ct. 505, 58 L. Ed. 954; Gritts v. Fisher, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928. The record here shows clearly that the Oneida Indians hold as tenants in common. Even under the state enactment, they were subject to the restrictions as to mode and manner of making conveyances, and these conditions have not been complied with in the attempted conveyance here in question. There are many acts indicating the exercise and enforcement of the jurisdiction of the federal government over the Indians in the state of New York, as is illustrated in the matters of trafficking in intoxicating liquors. The capacity of the United States to sue for the purpose of setting aside conveyances of land allotted to Indians under its care, where restrictions upon alienation have been transgressed, have been passed upon and reaffirmed. Marchie Tiger v. Western Improvement Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738; Bowling v. U. S., 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080; Heckman v. U. S., 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820. The Indian tribes are communities dependent upon the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Choctaw Nation v. U. S., 119 U. S. 1, 7 Sup. Ct. 75, 30 L. Ed. 306.

Affirming, as we do, the conclusion reached by the District Court, that the United States and the remaining Indians of the tribe of the Oneidas still maintain and occupy toward each other the relation of guardian and ward, and that the United States may maintain this action, we conclude that the partition action and judgment and the sale made thereunder are void, so far as they eject the Indians from the possession of the property. We do not think that the state of New York could extinguish the right of occupancy which belongs to the Indians. The state has never conferred the absolute and unrestricted right on these Indians to convey these lands, and we further approve the finding below that the attempted conveyance of the land did not comply with the act of 1849. The finding below that the attempted conveyance of these lands and the judgment of sale and partition is null and void is approved, as is the decree restoring the ejected Indians to possession.

Decree affirmed.

WARD, Circuit Judge (dissenting). The right of the United States to maintain this suit in ejectment depends, as it seems to me, upon the question whether the particular Oneida Indians whom the United States undertakes to represent are or are not tribal Indians. If they are not, the United States has no concern with them. United States v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. Ed. 1192. It is true that May 23, 1842, when the treaty between the state of New York and the Oneida Indians was made, they were tribal, and it is said

that for this reason the treaty is invalid; the United States not being a party to it. But this can hardly be maintained, in view of the great number of Indian treaties which the state has made without any approval of or co-operation with the United States, and upon which the title to immense areas of valuable lands depends. See the consideration of this subject by Judge Andrews in Seneca Nation v. Christie, 126 N. Y. 122, 27 N. E. 275. A special committee appointed by the Assembly of 1888 to investigate the Indian problem of the state annexed to their report 14 treaties with the Oneida Indians alone between 1788 and May 23, 1842, in which the United States had no part; the Indians conceding their title to the state of New York and the later treaties fixing the rights inter sese of those Oneidas who wished to emigrate to the West and those who wished to remain on the reservation.

Title to all tribal lands was in the British crown, subject to the Indians' right of occupancy, which title upon the Revolution vested in the colonies, and subsequently in the original states, under the Articles of Confederation and upon the establishment of the present government. The right of pre-emption went with this title to the states. The United States never had either the title to the lands or the right of pre-emption. Harcourt v. Gaillard, 12 Wheat. 523, 6 L. Ed. 716.

By the treaty of May 23, 1842, the Oneida reservation was divided into 19 lots; the Indians known as the Emigrating Party ceding their title to the state in lots 1, 3, 4, 5, 7, 10, and 15, and their title in lots 2, 6, 8, 9, 11, 12, 13, 14, 16, 17, 18, and 19 to the Home Party. Schedule B attached to the treaty enumerates the individuals comprising the Home Party by name and states that they hold their lands in severalty as tenants in common and owners. The lands now in question were part of lot 17, and 23 individuals, comprising 4 families, are named as tenants in common and owners of that lot; in other words, their Indian title of occupancy was changed into a title in fee simple.

This treaty was subsequently confirmed by an act of the Legislature. Chapter 185, Laws 1843. Section 1 provided:

"1. The Oneida Indians, owning lands in the counties of Oneida and Madison, are hereby authorized to hold their lands in severalty, in conformity to the surveys, partitions and schedules annexed to and accompanying the treaties made with the said Indians, by the people of this state, in the year one thousand eight hundred and forty-two, and now on file in the office of the secretary of state. * * *"

Sections 2, 3, 4, and 5 provided safeguards for the Indians in respect to alienation. Section 6 provided:

"6. The deeds and conveyances made as aforesaid shall convey all the right, title and interest of the said Indians or Indian, whose lands shall have been conveyed as aforesaid, of, in and to the same, and shall vest in the purchaser or purchasers, his or their heirs or assigns forever, an absolute estate of inheritance in fee simple."

The earliest deeds of conveyance by Oneida Indians of these lands in the chain of title to the defendants were executed in accordance with

the provisions of this act. But, because the later deeds after 1865 were not so executed, the court holds them to be void, and to convey no title to the defendants. This overlooks the fact that chapter 486, Laws 1847, relieves the Oneida Indians from the restriction of chapter 185, Laws 1843, abolishes the office of attorney for them, imposes the performance of his duties for two years on the superintendent of Indians, whose office was to cease in two years from the passage of the act, viz. December 15, 1849, and thereafter "the said Indians shall have power to sell and convey their real estate the same as if they were natural-born citizens of the United States." From that date I think that their tribal relation ceased to exist as matter of law. No wonder that the legislative committee of 1888 reported as to the Oneidas:

"They have no tribal relations and are without chiefs and other officers; they as a tribe receive no money from any source, but receive a small annuity from the general government, amounting to about 11 yards of cotton cloth to each person per year."

Judge Wallace held to the same effect in United States v. Elm, 25 Fed. Cas. 1006, No. 15,048.

It is said that chapter 420, Laws 1849, still imposed restrictions on the right of the Oneida Indians to convey, which restrictions were not thereafter observed in the deeds in the chain of title to the defendants, and therefore they were void and conveyed no title. This contention overlooks the fact that the act of 1849 applied only to tribal Indians, and did not repeal or qualify in any way chapter 486, Laws 1847, passed for the special benefit of 'these Oneida Indians.

The laws of New York relating to Indians have been consolidated three times, viz.: Chapter 92, Laws 1813; chapter 679, Laws 1892 (which repealed chapter 185, Laws 1843, and chapter 486, Laws 1847, relating to the Oneida Indians); and chapter 31, Laws 1909, being chapter 26 of the Consolidated Laws. In neither of these two later consolidations are the Oneida Indians mentioned at all, whereas the Onondagas, Senecas, Tuscaroras, the Saint Regis, and the Shinnecock Tribes were and still are regulated by them. It is perfectly clear that the Legislature no longer considers the Oneidas as a tribe or their land in question part of an Indian reservation. The above considerations make inquiry into the powers of Congress unnecessary, because those powers are concerned only with tribal Indians.

The judgment should be reversed.