337 F.3d 139
ONEIDA INDIAN NATION OF NEW YORK, Plaintiff-Counter-Defendant-Appellee,Ray Halbritter, Keller George, Chuck Fougnier, Marilyn John, Clint Hill, Dale Rood, Dick Lynch, Ken Phillips, Beulah Green, Ruth Burr, Brian Patterson, and Iva Rodgers, Consolidated-Defendants-Appellees,v.CITY OF SHERRILL, NEW YORK, Defendant-Counter-Claimant-Appellant,Madison County, Amicus Curiae-Appellant,Oneida County, Amicus Curiae,State of New York, Amicus Curiae.
Docket No. 01-7795.
Docket No. 01-7797.
United States Court of Appeals, Second Circuit.
Argued: May 13, 2002.
Decided: July 21, 2003.

COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Ira S. Sacks, Fried, Frank Harris, Shriver & Jacobsen New York, NY, for Defendant-Counter-Claimant-Appellant.
Michael R. Smith, Zuckerman Spaeder, LLP, Washington, DC (William W. Taylor, III, David A. Reiser, of counsel), for Plaintiff-Counter-Defendant-Appellee and Consolidated-Defendants-Appellees.
G. Robert Witmer, JR., Nixon Peabody LLP, Rochester, N.Y. (David M. Shraver, of counsel), for Amici Curiae-Appellants Madison County and Oneida County.
Andrew D. Bing, Assistant Solicitor General, Albany, N.Y. (Caitlin J. Halligan, Daniel Smirlock, Peter H. Schiff, of counsel, for Eliot Spitzer, Attorney General of the State of New York), for Amicus Curiae State of New York.
Before: VAN GRAAFEILAND, MESKILL, and B.D. PARKER, Jr., Circuit Judges.
Judge VAN GRAAFEILAND dissents in part in a separate opinion.
B.D. PARKER, Jr., Circuit Judge.

1
This case, consisting of four actions, addresses whether properties reacquired by the Oneida Indian Nation of New York ("OIN" or "the Oneidas") are subject to taxation by the City of Sherrill, New York and Madison County, New York. The OIN is a federally recognized Indian tribe, governed by a Nation Representative and a Tribal Council.1 The Oneidas lived on what became central New York State long before the founding of the United States. In the late eighteenth century most of the Oneidas' ancestral land was formally set aside by Congress as reservation land. During the nineteenth century much of it was sold to non-members of the tribe. But starting in the 1990s members of the tribe reacquired parcels in open-market transactions, and in 1997 and 1998 the purchases included several businesses and properties in Sherrill.2 These properties include two upon which the Oneidas operate a gasoline station, a convenience store, and a textile manufacturing and distribution facility (the "Sherrill Properties" or the "properties"). Contending that these properties are within their reservation and are, consequently, not subject to taxation, the Oneidas refused to pay the property taxes or to collect sales taxes on merchandise sold at the businesses.

2
Following this refusal, Sherrill purchased three of the properties at tax sales and, two years later, recorded deeds. Sherrill also started formal eviction proceedings. In response, the Oneidas sued Sherrill in the United States District Court for the Northern District of New York (the "Lead case"), contending that the land, as part of their historic reservation recognized principally by the 1794 Treaty of Canandaigua, is exempt from state and municipal taxation. The suit sought declaratory and injunctive relief prohibiting the evictions and the imposition of property taxes. Although the Sherrill Properties were purchased from non-Oneidas, the Oneidas claim that their purchases reestablished the properties as reservation land because the federal government — which alone has the power to do so — has never changed the reservation status of the land.3 Sherrill counterclaimed, seeking declaratory and injunctive relief and damages, asserting that, for a variety of reasons, the land had lost its reservation status and that the OIN has been unjustly enriched by municipal benefits received, but not paid for, after reacquisition.

3
Sherrill also petitioned the New York State Supreme Court, Oneida County, to order the eviction of the OIN from the properties (the "Eviction case"). The OIN, citing federal preemption, removed to federal court, contending that sovereign immunity barred Sherrill's claims. In response to this defense, Sherrill filed an action against the individual members of the Tribal Council (the "Members case"). Sherrill again sought eviction and also sought injunctive relief, forbidding council members from purchasing additional properties in the city.

4
These three cases were related to an additional action (the "Related case"), brought by the OIN against Madison County, concerning thirteen parcels of land also purchased by the OIN in the 1990s. As in the Lead case, the Oneidas sought declaratory relief that these properties are not subject to taxation, contending that, notwithstanding intervening nonIndian possession, these properties have remained reservation land.

5
Procedural strife followed. In the Lead case, Sherrill moved for summary judgment, for injunctive relief, and to amend its answer to add various affirmative defenses. The OIN opposed the motions and cross-moved for summary judgment in the Lead and Eviction cases, asserting principally that the parcels in question were non-taxable because they were located on reservation land in Indian country. See 18 U.S.C. § 1151. In the Members case, the OIN officers moved to stay or, in the alternative, to dismiss principally on grounds of sovereign immunity and the failure to name the OIN as a party. Madison moved to dismiss the Related case for failure to join two allegedly indispensable parties: the Wisconsin and Thames Oneidas. In November 2000, the State of New York, Madison and Oneida Counties, and a public company, Oneida Ltd., filed briefs as amici curiae in the Lead case in support of Sherrill's motion for summary judgment and in opposition to the OIN's cross-motion.

6
After the dust settled, the District Court issued a well-reasoned opinion resolving these various motions. Oneida v. City of Sherrill, 145 F.Supp.2d 226 (N.D.N.Y. 2001) ("Oneida IV"). It considered a number of issues but devoted a good deal of attention to what the parties considered — and what we agree — to be the basic question posed: whether the properties are in Indian country. Oneida IV, 145 F.Supp.2d at 241. The court concluded that, for a number of reasons, they are. The properties are part of the Oneidas' aboriginal lands and federally recognized reservation. The reservation's status was guaranteed by treaty obligations — principally in the 1794 Treaty of Canandaigua — and Sherrill did not carry its burden of demonstrating congressional action disestablishing the reservation. Accordingly, the District Court concluded that, as they are in Indian country, neither the Sherrill nor Madison Properties are taxable by Sherrill and Madison County, and granted the OIN judgment on its claims in the Lead case. Id. at 254-259.

7
Determining that the OIN was entitled to sovereign immunity, the court also granted judgment on Sherrill's counterclaims in the Lead case and denied Sherrill leave to amend its complaint. Id. at 258-59. The court granted the OIN judgment in the Eviction case as well, concluding that it was entitled to sovereign immunity. It also granted the council members' motion to dismiss in the Members case, concluding that they too were entitled to sovereign immunity and that, in any event, Sherrill had failed to join the OIN, which the court found to be an indispensable party. Finally, the court sua sponte granted the OIN judgment on the pleadings in the Related case, concluding that its findings with respect to the Sherrill Properties applied also to those located in Madison. Separately, the court denied Madison County's motion to dismiss that case. Oneida Indian Nation of N.Y. v. Madison County, 145 F.Supp.2d 268, 270-71 (N.D.N.Y.2001). Sherrill and Madison appealed.4 We agree with the District Court's principal conclusion that the OIN's Sherrill Properties are not taxable, and therefore affirm the judgment in the Lead, Eviction, and Members cases. Because we find, however, that the court's sua sponte grant of judgment on the pleadings in the Related case was procedurally improper, we vacate this judgment and remand for further proceedings.

BACKGROUND

8
I. Treaties Governing Rights to the OIN's Land

9
Since the land in question has been the subject of federal litigation off and on for more than one hundred and fifty years, before looking at the controlling legal issues, we briefly review how we reached this point in time. As previously noted, the parties contest whether land first occupied by the Oneidas in upstate New York before the founding of this country is, upon reacquisition by the Oneidas, subject to taxation by New York State and its municipalities.

10
The Oneidas are the direct descendants of members of the original Oneida Indian Nation, one of the six nations of the Iroquois Confederacy (the "Six Nations"), which were the most powerful Indian tribes in the northeastern United States at the time of the American Revolution. County of Oneida, N.Y. v. Oneida Indian Nation of N.Y., 470 U.S. 226, 230, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("Oneida II") (citing B. Graymont, The Iroquois in the American Revolution (1972)). The Six Nations are the Cayugas, Mohawks, Oneidas, Onondagas, Senecas, and Tuscaroras. New York Indians, 170 U.S. 1, 36, 18 S.Ct. 531, 42 L.Ed. 927 (1898) ("New York Indians II"). From time immemorial through the Revolutionary period, the Oneidas inhabited what is now central New York State. Their aboriginal lands covered approximately six million acres, from the Pennsylvania border to the St. Lawrence River, and from the shores of Lake Ontario to the western foothills of the Adirondack Mountains. Oneida II, 470 U.S. at 230, 105 S.Ct. 1245.

11
A. Nonintercourse Act and Canandaigua Treaty

12
With the adoption of the Constitution, Indian relations came exclusively under federal authority. See Oneida II, 470 U.S. at 234, 105 S.Ct. 1245; Oneida Indian Nation of N.Y. v. New York, 194 F.Supp.2d 104, 146 (N.D.N.Y.2002) (Oneida IIIb) ("[A]ny rights [in Indian land] possessed by the State prior to ratification of the Constitution were ceded by the State to the federal government by the State's ratification of the Constitution."). Article I, section 8, clause 3 of the Constitution, the Indian Commerce Clause, established Congress's power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3.

13
In 1790, Congress passed the first Indian Trade and Intercourse Act (the "Nonintercourse Act"), 1 Stat. 137, sharply limiting the alienability of Indian land. In essence, the Nonintercourse Act required federal consent for all land purchases from Indian nations. The 1793 amendments to the Act, which contain the language currently in effect, provided:

14
No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

15
Act of March 1, 1793, 1 Stat. 329 (1793) (codified at 25 U.S.C. § 177 (2000)); see generally Mohegan Tribe v. Connecticut, 638 F.2d 612, 616-18 (2d Cir.1980) (discussing history of and amendments to Nonintercourse Act).

16
The Supreme Court has consistently applied the principle, embodied in the Nonintercourse Act, that federal consent is required for purchases of Indian land or for the termination of aboriginal title. See, e.g., Oneida II, 470 U.S. at 232, 105 S.Ct. 1245; United States v. Santa Fe Pacific R. Co., 314 U.S. 339, 345, 62 S.Ct. 248, 86 L.Ed. 260 (1941) ("Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States.") (citing, among other authorities, Johnson v. McIntosh, 8 Wheat. 543, 5 L.Ed. 681 (1823) (refusing to recognize land titles originating in grants by Indians to private parties in 1773 and 1775 because they were contrary to principle that Indian title could only be extinguished by or with consent of federal government)). The absence of federal consent is the Oneidas' central argument in this litigation.

17
Another pivotal enactment was the 1794 Treaty of Canandaigua, 7 Stat. 44 (Nov. 11, 1794). This treaty recognized that the Oneida reservation covered approximately 300,000 acres,5 and the federal government undertook that it "[would] never claim [this land], nor disturb [the Oneidas] ... in the free use and enjoyment thereof: but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." 7 Stat. 45. On the strength of this treaty, which remains in force, the Oneidas contend that the land in Madison and Sherrill is reservation land in Indian country and, upon reacquisition, must be treated as such.

18
B. Indian Removal and the Treaty of Buffalo Creek

19
Notwithstanding the Nonintercourse Act's prohibition on purchases of Indian land, and despite federal government advice to the contrary,6 New York State repeatedly purchased Indian land within its borders. In a 1795 transaction, for instance, the OIN conveyed virtually all of its remaining land to New York in exchange for annual cash payments. Oneida II, 470 U.S. at 232, 105 S.Ct. 1245. Overall, more than thirty treaties of purchase were made with various segments of the tribe during the late eighteenth and early nineteenth centuries. See Jack Campisi, Oneida, in 15 Handbook of North American Indians 484 (Bruce G. Trigger ed., 1978) (hereinafter "Campisi"). The Madison properties purportedly were conveyed to the State in this manner. As Oneida lands were transferred to the State, they were surveyed and laid out in townships, which eventually were subdivided and sold to private parties. Individual Oneidas also sold land to private parties. The Sherrill Properties fall into this group of conveyances. The Oneidas contend that to the extent any of the purchases lacked congressional approval, they violated the Nonintercourse Act and the Treaty of Canandaigua.

20
Early in the nineteenth century, federal policy concerning eastern Indians changed from maintenance of their right of occupancy in ancestral lands to their removal west of the Mississippi River. This change was spurred by the states' desire to control the remaining unceded Indian land within their boundaries, by the incursion of settlers onto treaty-protected Indian land, and by the perceived inability of the Indians to assimilate. See David H. Getches et al., Cases and Materials on Federal Indian Law 93-95 (4th ed.1994) (hereinafter "Getches"); Felix S. Cohen, Handbook of Federal Indian Law 53-54 (1942) (hereinafter "Cohen"). Removal was deemed necessary to "mak[e] available for white settlement a vast area and solving the problem of conflict of authority caused by a presence of Indian nations within state boundaries." Cohen at 53.

21
Between 1810 and 1816, the Six Nations, facing pressure from New York State to remove,7 purchased approximately 500,000 acres in Wisconsin from the Menominee and Winnebago tribes.8 New York Indians II, 170 U.S. at 11-14, 18 S.Ct. 531. Several hundred Oneidas moved there during the 1820s, with only a small number remaining in New York. Id. at 14, 36, 18 S.Ct. 531; United States v. Boylan, 265 F. 165, 167 (2d Cir.1920); Campisi at 485. Those who stayed "held a single and undivided tract reserved out of the original Oneida reservation." Boylan, 265 F. at 167.

22
In 1830, Congress passed the Indian Removal Act, which reflected this shift in federal policy and allowed Indians to exchange their eastern lands for lands set aside in the west.9 See Act of May 28, 1830, 4 Stat. 411. The Act provided:

23
That it shall and may be lawful for the President of the United States to cause so much of any territory belonging to the United States, west of the river Mississippi, not included in any state or organized territory, and to which the Indian title has been extinguished, as he may judge necessary, to be divided into a suitable number of districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there....

Ch. 148, 4 Stat. at 411-12

24
The 1838 Treaty of Buffalo Creek, 7 Stat. 550 (Jan. 15, 1838), was enacted pursuant to this removal policy. Prucha at 202. Stimulated by the desire of Buffalo city leaders to "make room for the expansion of the city onto adjacent Seneca reservation lands," New York began a "fullscale drive ... to eliminate the Indians from the state and move them to lands west of Missouri." Id. Under the Treaty, the Six Nations and the St. Regis Indians agreed to remove from their New York and Wisconsin reservation lands to approximately 1.8 million acres in Kansas, which had been set aside as Indian territory. The Treaty provided that the new reservation lands were to provide "a permanent home for all the New York Indians, now residing in the State of New York, or in Wisconsin, or elsewhere in the United States, who have no permanent homes." Buffalo Creek Treaty, art. 2. The Treaty authorized a payment of $400,000 to cover the costs of removal. As discussed below, Sherrill and Madison claim that it effected the disestablishment of the Oneidas' reservation and the formal relinquishment, with congressional approval, of their possessory claim to the lands at issue.

25
The first eight articles and Article 15 of the Treaty set forth this basic bargain. Id., arts. 1-8, 15. Articles 9 through 14 reflect specific agreements between the government and individual tribes. Id., arts. 9-14. In Article 10, for example, the Senecas agreed to remove within five years to land in eastern Kansas, and the government approved the sale of their remaining New York land to two individuals, Thomas L. Ogden of the Ogden Land Company and Joseph Fellows. Id., art. 10; see New York Indians, 72 U.S. (5 Wall.) 761, 767, 18 L.Ed. 708 (1867) ("New York Indians I"). The Tuscaroras made a similar removal commitment in Article 14, which also confirmed the sale of their New York land to Ogden and Fellows. Buffalo Creek Treaty, art. 14.

26
At the time of the Treaty, only approximately 5000 of the original 300,000 acres of Oneida reservation land remained in their hands, the rest having been sold to New York or to private parties. Around 620 Oneidas still resided in New York. Buffalo Creek Treaty, Sch. A, Add. 29. Article 13 of the Treaty provided for the removal of these Oneidas, but only upon certain conditions:

27
The United States will pay the sum of four thousand dollars, to be paid to Baptista Powlis, and the chiefs of the first Christian party residing at Oneida, and the sum of two thousand dollars shall be paid to William Day, and the chiefs in securing the Green Bay country, and the settlement of a portion thereof; and they hereby agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Government of the State of New York for the purchase of their lands at Oneida.

28
Buffalo Creek Treaty, art. 13 (emphasis added).

29
The wholesale removal of the New York Indians to Kansas contemplated by the Treaty never occurred. See New York Indians II, 170 U.S. at 26-27, 18 S.Ct. 531 (noting that provision was only made for the "actual removal of more than about 260 individuals of the claimant tribes," and that none of the thirty two Indians who actually received Kansas allotments ever settled permanently there). For their part, the Oneidas residing in New York and Wisconsin refused to relocate to Kansas. See New York Indians II, 170 U.S. at 9-10, 18 S.Ct. 531. Hundreds of New York Oneidas moved instead to Wisconsin and to Ontario, Canada. By 1848 only approximately 200 Oneidas resided in New York. Campisi at 485. Thus, by the middle of the nineteenth century, three distinct bands of the tribe existed: the New York Oneidas, the Wisconsin Oneidas, and the Canadian ("Thames") Oneidas. Oneida IV, 145 F.Supp.2d at 235.

30
The record does not reflect any large block sales of reservation land to New York State by the Oneidas after 1842, when 1100 acres were conveyed. But as the exodus of members continued over the next half-century, reservation acreage inhabited by Oneidas shrank significantly, by some accounts to less than 100 acres. See Boylan, 265 F. at 165 (discussing action brought by federal government, on behalf of Oneidas, seeking ejectment of defendants from thirty-two acres of land, forming part of original Oneida reservation); Annual Report, Commissioner of Indian Affairs, 1890, 1893 (stating that the Oneida reservation contained only approximately 350 acres in 1890, and approximately 100 acres in 1893 when the tribe's New York branch itself numbered less than 200).

II. Land Claims Involving the OIN

31
Litigation involving the OIN and other New York Indians followed the Treaty of Buffalo Creek. Ogden and Fellows, who held fee title to Seneca lands under the Treaty, sued New York to void pre-removal tax assessments after the parcels had been sold to third parties because of the Senecas' nonpayment of state taxes. New York Indians I, 72 U.S. at 764-65. In 1867, the Supreme Court held that the taxation of the parcels was "premature and illegal" because it interfered with the Indians' possessory rights guaranteed by the federal government. "Until the Indians have sold their lands, and removed from them in pursuance of the treaty stipulations, they are to be regarded as still in their ancient possession, and are in under their original rights, and entitled to the undisturbed enjoyment of them." Id. at 770.

32
As noted, most of the Six Nations Indians did not remove to Kansas. The federal government disposed of the Wisconsin lands conveyed to it by the Indians, appropriated the unoccupied Kansas land and placed it in the public domain for sale to settlers. New York Indians II, 170 U.S. at 4, 24, 18 S.Ct. 531. The New York Indians sued, claiming entitlement to the Kansas lands ceded to them under the Treaty, and seeking the value of the land sold and the money the government had agreed to pay on their removal. Id. at 1-2, 18 S.Ct. 531.

33
Eventually the case reached the Supreme Court, which held in 1898 that the Buffalo Creek Treaty effected a present grant of the Kansas lands to the Indians and that forfeiture of these lands could occur only through legislative action. Simply opening the land to settlement, as the federal government had done, was insufficient. Accordingly, the Court concluded that the New York Indians, including the Oneidas, were entitled to money damages. Id. at 25-36, 18 S.Ct. 531.

34
Litigation involving the Oneidas' proprietary rights in their New York reservation lands began in the late nineteenth century. In 1885, some Oneidas conveyed reservation parcels to non-Indians but continued to live on the land. After the Indian occupants failed to meet mortgage obligations, the owner brought a foreclosure action and, following partition, the Indians were ejected. Reaffirming the principles embodied in the Nonintercourse Act, we held the ejectment improper because the original conveyance lacked the approval of the federal government: the "tribe could not sell, nor the individual members, for they have not an undivided interest in the tribal lands, nor alienable interest in any particular tract." Boylan, 265 F. at 174. We emphasized that "[a] transfer of the allotment to [non-Indians] is not simply a violation of the proprietary rights of the Indians; it violates the government rights of the United States." Id. at 173.

35
Many decades later, in 1970, the Oneidas sued Oneida and Madison Counties as a consequence of their occupation of an approximately 900-acre tract ceded by the OIN to New York in 1795. The Oneidas claimed that the occupation violated the Nonintercourse Act and sought to recover the land's fair rental value for a two-year period in the 1960s. The case reached the Supreme Court, which again affirmed the Oneidas' aboriginal possessory rights, concluding that the Nonintercourse Act and certain treaty obligations prohibited termination of these rights without federal approval. See Oneida Indian Nation of N.Y. v. County of Oneida, 414 U.S. 661, 675-78, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) ("Oneida I") (stating that the Oneidas had asserted "the not insubstantial claim that federal law now protects, and has continuously protected from the time of the formation of the United States, possessory rights to tribal lands, wholly apart from the application of state law principles which normally and separately protect a valid right of possession").

36
On remand, the district court found the counties liable to the Oneidas, and we affirmed. Oneida Indian Nation of N.Y. v. County of Oneida, 719 F.2d 525 (2d Cir. 1983). Hearing the case for a second time, the Supreme Court again affirmed, holding that the Oneidas could maintain a federal common law action based on the counties' allegedly illegal occupation of their lands and that the Nonintercourse Act did not preempt the tribe's claims. Oneida II, 470 U.S. at 236-40, 105 S.Ct. 1245. The watershed decisions in Oneida I and Oneida II established the OIN's right to challenge the deprivation of its historic title by the sales to New York in the late eighteenth and early nineteenth centuries.10

37
In 1974, the OIN and the Wisconsin Oneidas brought a similar suit against Oneida and Madison Counties, but of considerably greater scope. The Oneidas alleged that between 1795 and 1846, pursuant to some thirty agreements, New York State illegally acquired approximately 250,000 acres of Oneida reservation land in violation of the Nonintercourse Act. See Oneida Indian Nation of N.Y. v. County of Oneida, N.Y., 199 F.R.D. 61, 66 & n. 3 (N.D.N.Y.2000) ("Oneida IIIa"). The case was inactive during the pendency of Oneida I and II. In 1998, the United States intervened and joined the Oneidas in moving to add as defendants approximately 20,000 private landowners whom the Oneidas claimed were either liable for money damages or should be ejected. In September 2000, the district court concluded, following Oneida II, that the Oneidas could sue state entities for damages based on the illegal occupation of their historic reservation land but that ejectment and money damages from the individual landowners was not available, and the court declined to permit their joinder. See Oneida IIIa, 199 F.R.D. at 79-94.

38
In 1978 and 1979, the Oneidas also challenged New York State's purchases of their aboriginal lands in 1785 and 1788, under the Treaties of Fort Herkimer and Fort Schuyler, as violations of the Articles of Confederation, the Treaty of Fort Stanwix, and the 1783 Proclamation. We concluded, however, that the State had the right to make such purchases during the confederal period and dismissed the action. See Oneida Indian Nation of N.Y. v. New York, 860 F.2d 1145 (2d Cir.1988).

39
The next major litigation to reach our court was this group of consolidated cases where, as we have seen, the District Court granted summary judgment to the OIN, determining that the Sherrill and Madison Properties remained reservation land immune from local taxation.

DISCUSSION

40
We review the grant of a motion to dismiss or a motion for summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party. See Chambers v. Time Warner, 282 F.3d 147, 152 (2d Cir.2002); Young v. County of Fulton, 160 F.3d 899, 902 (2d Cir.1998). In reviewing a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), we accept as true all material facts alleged in the complaint. Chambers, 282 F.3d at 152. "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Id. (citation and internal quotation marks omitted). We apply this same standard in reviewing a grant of judgment on the pleadings pursuant to Rule 12(c). Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir.1999). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

I. Basic Principles

41
Three basic principles inform the disposition of this action. The first is the Indians' right of occupancy on tribal land, or "Indian country," which "may extend from generation to generation, and will cease only by dissolution of the tribe, or their consent to sell to the party possessed of the right of pre-emption." New York Indians I, 72 U.S. at 771. The second, embodied by the Nonintercourse Act, is federal preeminence over the disposition of land in Indian country. Since "Congress alone has the right to say when the [United States'] guardianship over the Indians may cease," Boylan, 265 F. at 171, the sale or conveyance of reservation land can only be made with congressional sanction, that is, "by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177 (2000). The third is federal preemption, which prohibits states from imposing property taxes upon Indian reservation land without congressional approval. New York Indians I, 72 U.S. at 771; see also Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management."); cf. Boylan, 265 F. at 170.

42
There is no material dispute that the Sherrill Properties were part of the Oneidas' aboriginal land and the tribe's reservation as recognized by the Treaty of Canandaigua. Sherrill contends, however, that because the properties are no longer within Indian country and the Oneidas no longer exist as a tribe, they are subject to taxation. We first address these contentions and then turn to the District Court's procedural rulings.

II. Indian Country

43
In general, "Indian country" refers to the geographic area in which tribal and federal laws normally apply and state laws do not. Section 1151 of Title 18 of the United States Code, defining "Indian country," provides:

44
The term "Indian country" ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (2000).11

45
Dependent Indian communities encompass any "area ... validly set apart for the use of the Indians as such, under the superintendence of the Government." Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 511, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). Indian allotments are those parcels allocated to tribes, as opposed to those opened to settlers, under federal policies designed to accommodate the westward movement of settlers and to promote the integration of Indians into the wider society. See generally Cass County, Minn. v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 106-07, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) (discussing federal allotment policy). Under § 1151, "[o]nce a reservation has been established, or a dependent Indian community shown to exist, it will remain Indian country until terminated by Congress, irrespective of the nature of the land ownership." Robert N. Clinton, Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze, 18 Ariz. L. Rev. 503, 513 (1976).

46
As noted, land in Indian country, including reservation land, is not subject to state taxation absent express congressional authorization. "The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union." Worcester v. Georgia, 31 U.S. 515, 557, 6 Pet. 515, 8 L.Ed. 483 (1832); see also White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 151, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 765, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) ("[T]he Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear."); McClanahan v. Ariz. State Tax Comm'n, 411 U.S. 164, 173-81, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

47
"The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." Rice v. Olson, 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945). It traces from the "doctrine of discovery," the law of Indian land tenure which the Supreme Court developed in the early nineteenth century to reflect European policy toward the Indians and to explain Indian sovereignty relative to colonial authority. See Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 572-74, 5 L.Ed. 681 (1823). The doctrine provided that the "discovering" European nations (and later the United States) held fee title to Indian aboriginal lands, subject to the Indians' right of occupancy and use. Oneida II, 470 U.S. at 234. As a result, no one could purchase Indian land or otherwise terminate aboriginal title without the consent of the discovering nation's sovereign. Id. As Chief Justice Marshall explained in Johnson v. McIntosh:

48
In the establishment of these relations, the rights of the original inhabitants were, in no instance, entirely disregarded; but were necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle, that discovery gave exclusive title to those who made it.

49
Johnson, 21 U.S. (8 Wheat.) at 574.

50
Generally speaking, nineteenth and twentieth century federal policy was consistent with this approach to Indian sovereignty, despite a notably inconsistent vision of the Indians' relationship to non-Indian citizens. While the tribes exercise inherent sovereign authority over their members and land located within state boundaries, they are nevertheless "domestic dependent nations" under federal protection. Cherokee Nation v. Georgia, 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831); see also Boylan, 265 F. at 172. The land they occupy is owned by the United States, which has retained the authority to regulate conveyances. As we have observed, "[w]hile the state[s] ha[ve] a right to make treaties with the Indians, [they] cannot interfere with the right[s] and obligations of the federal government." Boylan, 265 F. at 173. Although Indians' dependent status prohibits domestic and international political recognition, "it does assure them self-government, free of most state law strictures, over their territory and members, and, to a more limited extent, over non-Indians." Getches at 373-74; see Boylan, 265 F. at 174.

51
This "platonic notion[] of sovereignty," embodied in the so-called "Indian sovereignty doctrine," historically gave state law "no role to play" within a tribe's territorial boundaries. McClanahan, 411 U.S. 164, 168, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). While courts have moved towards reliance on firmer, more textually based concepts such as federal preemption to definitively resolve the rights of Indian tribes vis-à-vis the states, see id., the Indian sovereignty doctrine remains relevant because it provides a backdrop against which the applicable treaties and federal statutes must be read.

A. Set Aside and Superintendence

52
Sherrill contends that, even accepting the proposition that the properties are located within the Oneida reservation's historic boundaries, the parcels are taxable because they are not currently located within Indian country. Principally relying on Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), Sherrill asserts that the properties are not in Indian country because they were neither set aside by the federal government for Indian use nor placed under federal superintendence. Rather, the properties were acquired in private, open-market transactions and receive services from Sherrill, not the federal government.

53
In Alaska, the Supreme Court considered whether certain nonreservation land owned by members of the Venetie tribe in fee simple was located in Indian country. Id. at 527, 118 S.Ct. 948. The land had been part of the Neets'aii Gwich'in reservation, which had been disestablished pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 et seq. Title was then conveyed to the Venetie native corporations as tenants in common, which in turn transferred title to the tribe. Id. at 524, 118 S.Ct. 948. Because the reservation had been disestablished, and because no allotments were involved, "whether the Tribe's land is Indian country depend[ed] on whether it f[e]ll[] within the `dependent Indian communities' prong of the statute, § 1151(b)." Id. at 527, 118 S.Ct. 948. The Court concluded that the land was not Indian country because it neither had been "set aside by the Federal Government for the use of the Indians as Indian land" nor was "under federal superintendence" — two requirements, the Court found, that applied equally to reservations, dependencies, and allotments. Id. at 527, 532-34, 118 S.Ct. 948.

54
Sherrill argues that because the OIN, like the Venetie, purchased the properties in fee and can freely alienate them, the land cannot be in Indian country. We disagree. While questions may arise as to whether nonreservation property owned by Indians is in Indian country, there are no such questions with regard to reservation land, which by its nature was set aside by Congress for Indian use under federal supervision. See United States v. John, 437 U.S. 634, 638-47, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978) (holding that tribe's fee simple parcels on historic reservation were under federal control despite the fact that federal supervision of the tribe had not been continuous); cf. Donnelly v. United States, 228 U.S. 243, 269, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (holding that reservation land is Indian country).12

55
Because the Sherrill Properties are located on the Oneidas' historic reservation land set aside for the tribe under the Treaty of Canandaigua, they satisfy the set aside and superintendence requirements of 18 U.S.C. § 1151.13 Moreover, just as Alaska concluded that the "mere provision" of federal services on the tribe's property did not make it Indian country, the provision of certain state services to the Oneidas by Sherrill does not eliminate that status. See Alaska, 522 U.S. at 534, 118 S.Ct. 948.

B. Alienability

56
Alternatively, Sherrill argues that the properties are not in Indian country because they are freely alienable. Relying on Cass County, Sherrill contends that the reacquisition of freely alienable, former reservation land by an Indian tribe "does not cause the land to resume tax-exempt status ... unless and until [it is] restored to federal trust protection under [25 U.S.C. § 465]."14 Sherrill Br. at 35 (quoting Cass County, 524 U.S. at 115, 118 S.Ct. 1904). Cass County, however, offers Sherrill little help. There, Congress explicitly had made land in Indian country freely alienable by providing for the "complete cession and relinquishment" of all tribal title in Minnesota. Cass County, 524 U.S. at 108, 118 S.Ct. 1904. Afterwards, the land had been subject to federal allotment and sold to non-Indians. Because "alienability equals taxability," the Court found the land in question to be taxable. Id. at 109, 113, 118 S.Ct. 1904 (citing County of Yakima v. Confederated Tribes & Bands of Yakima Nation, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992); Goudy v. Meath, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906)). In contrast, the Sherrill Properties are located on reservation land, a status which Congress has never changed. Since Congress has not done so, the properties did not become freely alienable and taxable simply because the OIN purchased them on the open market and currently holds them in fee simple. See Solem v. Bartlett, 465 U.S. 463, 471, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) ("Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."). State and local governments may not tax reservation land "[a]bsent cession of jurisdiction or other federal statutes permitting it." County of Yakima, 502 U.S. at 258, 112 S.Ct. 683. Sherrill can point to neither.

57
Sherrill is troubled by the seeming "impossibility" that the Oneidas' free-market purchase of land within their ancient ancestral homeland could instantly render the parcels free from taxation and by the potential hardship to local municipalities and residents resulting from the Oneidas' "recreat[ion]" of "a tribal homeland." Sherrill Br. at 37. It suggests that this result is inconsistent with the conclusion of other courts that, even when a reservation has not been disestablished, Indians who no longer own parcels on the reservation cannot base claims to possessory rights on the Nonintercourse Act. Id. at 32-34 (citing Oneida IIIa; Cayuga Indian Nation v. Cuomo, Nos. 80-CV-930, 80-CV-960, 1999 WL 509442 (N.D.N.Y. July 1, 1999)).

58
But there is no inconsistency. The authorities Sherrill points to address the judicial remedies available for interference with the possessory rights of Indian plaintiffs, not the existence of those rights. In Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 357-59, 47 S.Ct. 142, 71 L.Ed. 294 (1926), for example, the Supreme Court held that the proper remedy for the wrongful taking of Indian land that was subsequently settled and developed was monetary damages rather than repossession by the tribe. This principle became known as the "impossibility" doctrine because it was based on the impracticability of uprooting current property owners where Indians held a valid possessory claim to land on which others had settled.

59
Our case is different. Recognizing the Oneidas' possessory rights in their historic reservation land, and the accompanying exemption from state taxation, does not require uprooting current property owners, because the Oneidas currently own the properties in question. Consequently, the threat from eviction present in Oneida IIIa and Cayuga is not present here. And Sherrill's argument that the removal of property from local tax rolls is a "hardship" that "upsets settled expectations" only begs the question whether the city is authorized to tax the properties.

60
The critical dichotomy, which Sherrill does not acknowledge, is between historic Indian title and fee ownership of the land itself. Indian or aboriginal title is the right of a tribe to use and occupy lands it has inhabited from time immemorial. See Oneida II, 470 U.S. at 234, 105 S.Ct. 1245. When a reservation has been disestablished, as in Alaska or Cass County, Indian title is extinguished and the only pertinent inquiry for ownership purposes is fee title. But when Indian land has been alienated in ways inconsistent with federal law, Indian title remains with the tribe. The Indian-country status of the alienated land is irrelevant for tax purposes when non-Indians hold fee title, since they pay state taxes. But when the tribe holding Indian title reacquires former reservation land, both forms of title coexist. Cf. United States v. Sandoval, 231 U.S. 28, 48, 34 S.Ct. 1, 58 L.Ed. 107 (1913) (rejecting position that Indian lands held in fee simple by Pueblo cannot be Indian country). The Indian-country status of the land therefore becomes fully relevant: the state cannot tax it and the tribe can no longer legally alienate it, at least without federal approval.

61
At first glance, this "coexistence" of titles appears uneasy, because the validity of the Oneidas' Indian title depends on a finding that the properties were alienated in violation of the Nonintercourse Act. And if this is so, then the chain of fee simple title, of which the Oneidas are now part, is invalid. This unease is ultimately unwarranted, however, because the OIN's possessory rights are grounded in its unextinguished Indian title, just as they were prior to the 1805 conveyance. Acquisition of the properties, as the tribe asserts, was the least disruptive means of effectuating these possessory rights. Because the previous fee owners relinquished any claims to the land, the OIN's rights may be fully realized. Accordingly, we conclude that the OIN's purchase of the Sherrill Properties in fee simple neither rendered them freely alienable nor deprived them of their Indian-country status.

62
III. Effect of the Buffalo Creek Treaty on Oneida's Property Rights

63
Both of Sherrill's arguments for why the properties are not in Indian country rest on the claim that the land is no longer in an Indian reservation. This claim is grounded in the 1838 Buffalo Creek Treaty which, Sherrill and the amici contend, formally disestablished the Oneida reservation. Again, we disagree. Before returning to the text of this treaty, it is helpful to note certain basic canons of Indian treaty construction.

A. Canons of Indian Treaty Construction

64
Treaties are generally more closely linked to the historical events surrounding their negotiation and passage than are private agreements. They are, accordingly, "construed more liberally ..., and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 87 L.Ed. 877 (1943). This is particularly true with regard to Indian treaties. "`The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians [with respect to tribal lands],' and the Indians' unequal bargaining power when agreements were negotiated." Hagen, 510 U.S. at 423 n. 1, 114 S.Ct. 958 (Blackmun, J. dissenting) (quoting Oneida II, 470 U.S. at 247, 105 S.Ct. 1245). This relationship, and the notions of Indian sovereignty and self-government embodied in it, "provide[] an important `backdrop' against which vague or ambiguous federal enactments must always be measured." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (quoting McClanahan, 411 U.S. at 172, 93 S.Ct. 1257 (1973)).

65
It is, moreover, "well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Oneida II, 470 U.S. at 247, 105 S.Ct. 1245 (citations omitted). Any finding that Congress has abrogated Indian treaty rights is inappropriate "[a]bsent explicit statutory language." Oneida II, 470 U.S. at 247, 105 S.Ct. 1245 (citation and internal quotation marks omitted); cf. Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe, 473 U.S. 753, 774, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985). Congress's intention in that regard, in other words, must be "clearly expressed."15 Hagen, 510 U.S. at 423 & n. 1, 114 S.Ct. 958 (Blackmun J., dissenting).

66
B. Disestablishment and Diminishment Generally

67
The Supreme Court applied and elaborated these canons in considering issues of reservation disestablishment and diminishment most recently in the "surplus land act" cases.16 These cases dealt with land claims arising from the allotment era and specifically addressed whether certain un-allotted lands opened for settlement to non-Indians remained in Indian country. Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), for example, involved a writ of habeas corpus sought by a non-Indian who had been tried and convicted in state court for a crime committed on a Sioux reservation. The question presented was whether the state had jurisdiction over the petitioner by virtue of the Cheyenne River Act, which had authorized the Interior Secretary to allot a portion of the reservation to homesteaders. In concluding that the reservation had not been diminished, the Court set forth the standard for identifying the "clear" expressions of congressional intent needed to find diminishment. It began by noting that

68
only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.... Congress [must] clearly evince an intent to change boundaries.

69
Id. at 470, 104 S.Ct. 1161 (emphasis added) (citations and internal quotation marks omitted).

70
Although "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests" can be helpfully probative, particularly when buttressed by fixed compensation for the opened lands, id., this language is not a prerequisite for a finding of diminishment. Rather, an act's legislative history and the subsequent treatment of the land (including settlement patterns), may also suffice:

71
When events surrounding the passage... — particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative Reports presented to Congress — unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged. To a lesser extent, we have also looked to events that occurred after the passage of a surplus land Act to decipher Congress' intentions. Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unalloted open lands. On a more pragmatic level, we have recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land Act diminished a reservation. Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred. In addition to the obvious practical advantages of acquiescing to de facto diminishment, we look to the subsequent demographic history of opened lands as one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers.

72
Solem, 465 U.S. at 471-72, 104 S.Ct. 1161 (citations omitted); see also South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 344, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (stating that the Court may consider "`the historical context surrounding the passage of the surplus land Acts,' and to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there" (quoting Hagen, 510 U.S. at 411, 114 S.Ct. 958)).

73
But when these elements, considered in their totality, "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." Solem, 465 U.S. at 472, 104 S.Ct. 1161. The same analysis applies to the termination or disestablishment of a reservation. See DeCoteau v. Dist. County Court for the Tenth Judicial Dist., 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) ("[The Supreme Court] does not lightly conclude that an Indian reservation has been terminated.... `[T]he Court requires that the congressional determination to terminate ... be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history.'") (quoting Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)).

74
Applying these principles, the Supreme Court has found language supporting diminishment in cases where the operative portion of a surplus land act reflects an Indian agreement to "cede, sell, relinquish and convey" opened lands. See, e.g., Yankton, 522 U.S. at 344, 118 S.Ct. 789; DeCoteau, 420 U.S. at 439, 441 n. 22, 95 S.Ct. 1082; Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 591 & n. 8, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Similarly, in Hagen v. Utah, the operative language provided that "all the unallotted lands within said reservation shall be restored to the public domain," 510 U.S. at 412, 114 S.Ct. 958 (emphasis added), which the Court found indicated a congressional intent to diminish. Id. at 414, 114 S.Ct. 958.

75
In each of these cases, the Supreme Court found a textually grounded intention to diminish supported by legislative history. To varying degrees the Court also found other support such as contemporaneous congressional and administrative statements, proclamations opening the reservation to settlement, the state's assumption of jurisdiction over the opened lands, and the subsequent pattern of settlement. See Yankton, 522 U.S. at 351-57, 118 S.Ct. 789; Hagen, 510 U.S. at 416-21, 114 S.Ct. 958; DeCoteau, 420 U.S. at 437-49, 95 S.Ct. 1082; Rosebud, 430 U.S. at 592-615, 97 S.Ct. 1361.

C. The Buffalo Creek Treaty

76
As we have seen, Articles 1 and 2 of the Buffalo Creek Treaty summarize the central bargain between the New York Indians and the federal government: the cession of the New York Indians' Wisconsin lands in exchange for reservation land in Kansas. Most of the remainder of the Treaty addresses the Kansas tract and various other tribe-specific arrangements. Articles 10 and 14 contain explicit cession language for the New York territory of two tribes, the Senecas and Tuscaroras. Buffalo Creek Treaty, arts. 10, 14; see New York Indians II, 170 U.S. at 21, 18 S.Ct. 531 (stating that the Senecas' and Tuscaroras' agreements "indicate[d] an intention on the part, both of the Government and the Indians, that they should take immediate possession of the tracts set apart for them in Kansas"). In contrast, Article 13, which addresses the Oneidas, contains no such language:

77
The United States will pay [certain sums to certain Oneidas] ... for expenses incurred and services rendered in securing the Green Bay country, and the settlement of a portion thereof; and they hereby agree to remove to their new homes in the Indian territory, as soon as they can make satisfactory arrangements with the Governor of the State of New York for the purchase of their lands at Oneida.

78
Buffalo Creek Treaty, art. 13 (emphases added).

79
Nothing in its text provides "substantial and compelling" evidence of Congress's intention to diminish or disestablish the Oneidas' New York reservation.17 There is no specific cession language, and no fixed-sum payment for opened land in New York; rather there is only the possibility of a sale for "uncertain future proceeds." DeCoteau, 420 U.S. at 448, 95 S.Ct. 1082 (describing arrangement in Mattz, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92). Article 13 at best is ambiguous about whether removal to Kansas was required. More properly, it reflects a simple agreement to agree. While the Oneidas agreed to remove, removal was conditioned on speculative future arrangements between the Indians and a third party, New York's governor. See New York Indians II, 170 U.S. at 28, 18 S.Ct. 531 ("It... appears, from the eleventh, twelfth, and thirteenth findings [of the Treaty], that the President never fixed any time for [the Indians'] removal, as was contemplated in the third article.") This contingency is reflected by the comments of Ransom Gillet, a federal Indian commissioner who participated in the Treaty negotiations and whose declaration is appended to the final document. Gillet stated that, in obtaining the Oneidas' consent to the treaty, he "most solemnly assure[d] them that the treaty does not and is not intended to compel the Oneidas to remove from their reservation in the State of New York .... The treaty gives them lands if they go to them and settle there but they need not go unless they wish to. When they wish to remove they can sell their lands to the Governor of the State of New York and then emigrate. But they will not be compelled to sell or remove."18 Statement of Ransom H. Gillet at Oneida Castle, Aug. 9, 1838 (emphasis added); see also Report of the Committee of Indian Affairs, State of New York, Mar. 24, 1847, at 4 (transcribing statement by a federal Indian commissioner to the Six Nations that they were not obligated to remove west). As it turned out, the sales to New York State were never accomplished, and the planned removal never took place. Oneida IIIb, 194 F.Supp.2d at 142.

80
Article 3 of the Treaty, moreover, contemplates that some tribes might not remove from their New York lands:

81
[S]uch of the tribes of the New York Indians as do not accept and agree to remove to the country set apart for their new homes within five years, or such other time as the President may, from time to time, appoint, shall forfeit all interest in the lands so set apart, to the United States.

82
Buffalo Creek Treaty, art. 3 (emphasis added); see New York Indians II, 170 U.S. at 28, 18 S.Ct. 531. Accordingly, the Treaty's text contains neither an obligation to remove nor any indication of a congressional intention to disestablish the Oneidas' New York reservation.

83
Sherrill and the amici nonetheless observe that certain legislative and administrative documents, such as "representative" reports of the Commissioner of Bureau of Indian Affairs spanning the period 1890 to 1997 and a 1981 Senate Report preceding the passage of New York's Indian jurisdictional statute, 25 U.S.C. § 233,19 demonstrate that the Oneidas no longer have a New York reservation. While congressional and administrative references to the reservation may bear some general relevance to congressional intent, see Yankton, 522 U.S. at 351, 118 S.Ct. 789, the references cited by Sherrill, the earliest of which was decided a half-century after the Treaty's proclamation, indicate little if anything about Congress's intent in 1838. Given the absence of anything in the Buffalo Creek Treaty's text or legislative history supporting disestablishment, we conclude that these later documents do not "unequivocally reveal" the intention necessary to demonstrate disestablishment.20 Solem, 465 U.S. at 471, 104 S.Ct. 1161.

84
Moreover, two enactments in the wake of the Buffalo Creek Treaty weigh against disestablishment. Under an 1842 treaty between the Oneidas and New York, certain Indians who had not migrated to Wisconsin sold a portion of their New York land (amounting to some 1100 acres) to the State. This treaty provided for the conveyance of certain lots to the State and other lots to non-removing Indians to be held as "common property." Boylan, 265 F. at 168 (quoting Treaty of 1842, arts. 1, 6). We later described this purchase as "such portion of the reservation as represented the equitable share in the proportion to the number of Indians who migrated." Id. at 167-68 (emphasis added). Finally, an 1843 enactment of the New York legislature, which sought to allow the Oneidas to hold their lands in severalty and (improperly) to alienate them by majority vote of the chiefs and head men of the tribe, makes explicit reference to "lands and property in the Oneida reservation." Id. at 169 (emphasis added) (quoting Act Relative to the Oneida Indians, Laws of the State of New York, 66th Sess., 244-46, Ch. 185, Sec. 1 (Apr. 8, 1843)).21

85
Sherrill and New York State also suggest that federal Indian removal policy, reflected in the Buffalo Creek Treaty, itself requires a finding that Congress intended to disestablish the reservation. In particular, the State argues that the "removal policy's goal of reducing conflicting state and tribal sovereignty could be accomplished only if Oneida sovereignty over the area from which the Nation was obligated to remove was terminated." New York Br. at 13. But this argument ignores both the requirement that removal language be "clearly expressed," as well as the text of the Removal Act, which permits the President to provide western lands to "such tribes or nations of Indians as may choose to exchange the lands where they now reside, and move there." 4 Stat. 411 (emphasis added). The State's argument also ignores the success of the Buffalo Creek Treaty in facilitating the removal of tribes other than the OIN. As the lower court found, the Treaty provided for the absolute cession of New York land for certain tribes, in particular the Senecas and Tuscaroras. The fact that certain parts of the Treaty provided for cession and other parts did not demonstrates that when Congress wished to disestablish a reservation, it knew what language to employ.

86
Sherrill and the amici next argue that the subsequent treatment of the reservation, in particular the pattern of its settlement and its jurisdictional history, reflects a congressional intention to disestablish. They point out that few Oneida Indians reside today in Madison and Oneida Counties, and they contend that the unabated reduction over time of the reservation's members and acreage supports de facto disestablishment.

87
At the time of the Buffalo Creek Treaty's proclamation, however, only 5000 of the original 300,000 acres remained under Oneida ownership, principally due to sales of land to the State. And, according to the amici's evidence, by far the largest influx of non-Indians to both Madison and Oneida Counties likewise occurred prior to 1840. Br. of Amici Curiae Madison County and Oneida County at 11 (table); id. at 2, 7 (stating that "[b]y the early nineteenth century, the area had lost its Indian character and had been settled and developed by non-Indians"). Not surprisingly, the most significant population changes occurred when the bulk of the land was alienated. Id. at 11. The fact that the Indian population and reservation acreage further decreased between 1840 and 1920 is not persuasive evidence that the Buffalo Creek Treaty was meant to disestablish the reservation.

88
In any event, subsequent settlement patterns are of limited use in demonstrating disestablishment. Yankton Sioux, 522 U.S. at 356, 118 S.Ct. 789 (finding demographic evidence the "least compelling" because "[e]very surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the `Indian character' of the reservation, yet we have repeatedly stated that not every surplus land Act diminished the affected reservation"); Hagen, 510 U.S. at 440-41, 114 S.Ct. 958 (Blackmun, J., dissenting) ("Absent other plain and unambiguous evidence of a congressional intent, we never have relied upon contemporary demographic or jurisdictional considerations to find diminishment."). Because the Oneidas sold most of their land to the State or private parties well before the Buffalo Creek Treaty and the flood of non-Indians into the area is not clearly linked to the Treaty, the gradual reduction in the number of Oneidas living on their reservation does not reflect a clear congressional intent to disestablish it.

89
Finally, Sherrill contends that the continued existence of the Oneidas' reservation is incompatible with the damage award they received in New York Indians II as a consequence of the appropriation of their Kansas land. Recall that in New York Indians II, the Supreme Court found that the Buffalo Creek Treaty had effected a present grant of the Kansas lands to the OIN and that, because the land had been improperly appropriated and settled by non-Indians, the tribes were entitled to damages in the amount the government had received as the sale price. 170 U.S. at 19-21, 36, 18 S.Ct. 531. The fact that the OIN received a portion of the resulting $2 million award, Sherrill argues, evidences an "exchange" of the Oneidas' New York land for land in Kansas, which supports a finding of disestablishment.

90
The focus of the Buffalo Creek Treaty, however, was the exchange of Wisconsin land — not New York land — for that in Kansas. See Buffalo Creek Treaty, arts. 1, 2. The Supreme Court's decision in New York Indians II, as Sherrill acknowledges, reflects this bargain. See 170 U.S. at 2, 18 S.Ct. 531 (petition stated that "the claimants ceded and relinquished to the United States all their right, title, and interest in and to certain lands of the claimants at Green Bay, State of Wisconsin"); id. at 19, 29, 18 S.Ct. 531 (discussing case in terms of the "seizure and sale of the Wisconsin lands"). The divestiture by the Senecas and Tuscaroras of their New York land, as the Court pointed out, indicated those tribes' "intention ... that they should take immediate possession of the tracts set apart for them in Kansas." Id. at 21, 18 S.Ct. 531. The Court said nothing about such a divestiture by the Oneidas.

91
Sherrill contends that the damage award "logic[ally]" incorporates the unstated conclusion that the Oneidas' New York reservation had been disestablished. Sherrill Br. at 40. This argument, for which Sherrill has provided no authority, ignores what was decided in New York Indians II. The exchange of Wisconsin for Kansas lands under the Treaty itself was the rationale for the award; the fact that some of the Oneidas' land had not been conveyed to the government was irrelevant. The few thousand acres of New York reservation land at issue appear even less significant to the award when one considers that the Treaty included a 65,000-acre carve-out in Wisconsin so the Oneidas could maintain a reservation there. Buffalo Creek Treaty, art. 1.22

92
Construing the Buffalo Creek Treaty liberally and resolving, as we must, all ambiguities in the Oneidas' favor, we conclude that neither its text nor the circumstances surrounding its passage and implementation establish a clear congressional purpose to disestablish or diminish the OIN reservation.

IV. Continuous Tribal Existence

93
Sherrill further argues that there are, at a minimum, "disputed issues of fact" as to whether the OIN has maintained its tribal existence so as to be entitled to claim the properties as reservation land. It argues that the fact that the OIN is a currently recognized tribe is irrelevant, because as a practical matter it has not existed continuously over the last century. In support of this argument, Sherrill chronicles the gradual reduction in population of the OIN, pointing to statistics reflecting the non-Indian influx to Madison and Oneida Counties. Any lapse in tribal identity, Sherrill concludes, rendered the OIN's land freely alienable and precludes the tribe from asserting rights in its historic reservation land. Such a determination would, in turn, defeat the OIN's claims to tax exemption.

94
Sherrill's argument assumes that a tribe's land loses its reservation status in the event of a temporary lapse of tribal organization or identity. We find, however, no requirement in the law that a federally recognized tribe demonstrate its continuous existence in order to assert a claim to its reservation land. Indeed, the Supreme Court held in United States v. John that a Mississippi resident of Choctaw Indian blood was properly under federal jurisdiction when he committed a crime on Choctaw land which had been designated a reservation, even though the tribe was "merely a remnant of a larger group of Indians, long ago removed ... [and] federal supervision over them has not been continuous." 437 U.S. 634, 653, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978).

95
The authority upon which Sherrill relies, which concerns the Nonintercourse Act, does not indicate otherwise.23 In Golden Hill Paugussett Tribe v. Weicker, 39 F.3d 51, 56 (2d Cir.1994), we stated that, in order to make a prima facie case based on a violation of the Act, a group claiming to be an Indian tribe must establish that: "(1) it is an Indian tribe, (2) the land [claimed to have been alienated in violation of the Act] is tribal land, (3) the United States has never consented to or approved the alienation of this tribal land, and (4) the trust relationship between the United States and the tribe has not been terminated or abandoned." All four elements are satisfied here. It is undisputed that the OIN is federally recognized and the Bureau of Indian Affairs exercises jurisdiction over, at a minimum, a thirty-two acre parcel of land within Madison County, which formed part of the OIN's historic reservation. This reservation has never been disestablished, and accordingly, the "trust relationship" between the federal government and the Oneidas has never been terminated. Nor have the Oneidas ever voluntarily abandoned this trust relationship by "choos[ing] to terminate tribal existence." Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 587 (1st Cir. 1979) (Mashpee I).24 Finally, the federal government never approved the alienation of the land at issue.

96
Moreover, contrary to Sherrill's contentions, even if continuous tribal existence were required, the record before us shows it. Once a tribe has been recognized, the removal of that recognition, like reservation diminishment or disestablishment, is a question for other branches of government, not the courts. See United States v. Holliday, 70 U.S. (3 Wall) 407, 419, 18 L.Ed. 182 (1865) ("In reference to all matters [of tribal organization], it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs."); see also Mashpee Tribe v. Secretary of the Interior, 820 F.2d 480, 484 (1st Cir.1987) (Mashpee II) (same). The OIN is a federally recognized tribe that is a direct descendant of the original Oneida Indian Nation. Oneida II, 470 U.S. at 230, 105 S.Ct. 1245; Oneida IIIb, 194 F.Supp.2d at 119. And Sherrill has identified no legislative or executive action withdrawing recognition.

97
Rather, the authorities offered by Sherrill merely reflect the opinions of a handful of government officials and commentators, at various points in the last century, that Oneida tribal relations had ceased.25 In particular, letters from the Assistant Commissioner of Indian Affairs in 1916 and 1925 stated that the tribe no longer existed in New York.26 This conclusion is, to some degree, understandable, since most of the Oneida reservation land had been sold to the State, with the remaining parcels divided among members who, increasingly, lived separately from one another and received state services. See Boylan, 265 F. at 167-70. But these informal conclusions are ultimately irrelevant because they do not supply the necessary federal action withdrawing the tribe from government protection we held was required in Boylan. Id. at 171. Moreover, this Court determined in Boylan in 1920 — between the time of the two letters in question — that the Oneida tribe did in fact exist. Id. at 171-72.

98
Because the Oneidas' reservation was not disestablished and because the Sherrill Properties are located within that reservation, we conclude that Sherrill can neither tax the land nor evict the Oneidas. Accordingly, we: (i) affirm the denial of Sherrill's motion for summary judgment or for a preliminary injunction based on its counterclaims in the Lead case; and (ii) affirm the grant of the OIN's cross-motion for summary judgment on its taxation claim and Sherrill's counterclaims27 in the Lead case and its cross-motion for summary judgment in the Eviction case.

V. Sherrill's Rule 56(f) Motion

99
Sherrill and the State of New York contend, in the alternative, that the District Court prematurely decided the OIN's cross-motions for summary judgment without affording Sherrill an adequate opportunity to conduct discovery on certain critical matters, in particular: (i) whether the Sherrill Properties are located within the boundaries of the reservation recognized by the Canandaigua Treaty; (ii) whether Congress modified the Canandaigua Treaty via the Buffalo Creek Treaty or otherwise; (iii) the Oneidas' continuous tribal existence; (iv) whether the properties were encompassed by the 1805 and 1807 land transfers; and (v) whether those transfers violated the Nonintercourse Act.

100
Federal Rule of Civil Procedure 56(f) provides an opportunity to postpone consideration of a motion for summary judgment and to obtain additional discovery by describing: (i) the information sought and how it will be obtained; (ii) how it is reasonably expected to raise a genuine issue of material fact; (iii) prior efforts to obtain the information; and (iv) why those efforts were unsuccessful. Sage Realty Corp. v. Ins. Co. of N. Am., 34 F.3d 124, 128 (2d Cir.1994). The District Court denied Sherrill's motion principally because Sherrill failed to explain why it was unable to obtain the discovery sought, much of which was a matter of public record, before the close of briefing. The court also noted that Sherrill had failed to identify the information sought with particularity. We review a lower court's denial of a Rule 56(f) motion for abuse of discretion. Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir.1994).

101
Sherrill's Rule 56(f) affidavit is simply a list of issues on which it desires more information. No specific facts or documents are requested, and Sherrill fails to indicate how any of the information sought could be expected to create genuine factual issues. Sherrill, moreover, has had a sufficient opportunity to develop and contest the issues on which it now claims to need additional discovery. Sherrill, like the amici, has submitted voluminous evidence in support of its position on disestablishment, tribal existence, and the Nonintercourse Act, evidence which the District Court fully considered. Sherrill was the first party to move for summary judgment — five months into discovery — on the issue of the OIN's tax liability. Under these circumstances, we conclude that the District Court did not abuse its discretion in denying the motion.

VI. Sherrill's Motion for Leave to Amend

102
In the Lead case, Sherrill moved for leave to amend its answer to add the affirmative defenses of statute of limitations, laches, waiver, estoppel, in pari delicto, and ratification, all of which the lower court denied on futility grounds. Oneida IV, 145 F.Supp.2d at 259-60. On appeal, Sherrill contends that the District Court improperly denied it the opportunity to advance these defenses. We disagree.

103
We review the denial of a motion for leave to amend for abuse of discretion. Jones v. N.Y. State Div. of Military & Naval Affairs, 166 F.3d 45, 49 (2d Cir. 1999). Where, as here, the denial was based on an interpretation of law, we review that legal conclusion de novo. Id. While leave to amend a pleading shall be freely granted when justice so requires, Fed.R.Civ.P. 15(a), amendment is not warranted in the case of, among other things, "futility." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6). Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir.1991).

104
We agree with the lower court that Sherrill's proposed defenses would not survive such a motion. We find the in pari delicto and ratification defenses insufficient. Oneida IV, 145 F.Supp.2d at 260. Addressing delay-based arguments in Oneida II, the Supreme Court held that no federal limitations period applied and that it would be improvident to apply a parallel state requirement in this uniquely federal context. 470 U.S. at 240-44, 470 U.S. 226. As the Court pointed out, there is no time-bar for claims brought by the United States on behalf of Indians "to establish title to, or right of possession of, real or personal property." Id. at 241-43 & n. 15, 105 S.Ct. 1245. The Oneida II majority also strongly suggested that a laches defense is improper for similar reasons. Id. at 244-45 & n. 16, 105 S.Ct. 1245 ("[T]he application of laches would appear to be inconsistent with established federal policy.") (citing Ewert v. Bluejacket, 259 U.S. 129, 137-38, 42 S.Ct. 442, 66 L.Ed. 858 (1922) (doctrine of laches cannot bar a suit by individual Indians challenging land transactions for violating federal statutory restrictions on alienation)).

105
We likewise have found — in ruling on the merits of a defense in an action involving an Oneida land claim — that time-bars are inconsistent with established federal policy, because "to permit a state to enact and invoke a time-bar would in effect allow a state to terminate the relationship of trust and guardianship between the United States and the Oneidas ... [which] may only be terminated by federal law." Oneida Indian Nation of N.Y. v. New York, 691 F.2d 1070, 1084 (2d Cir.1982); see also Oneida Indian Nation of N.Y. v. New York, 860 F.2d 1145 (2d Cir.1988) (accepting rejection of laches defense as law of the case). The result would be the same regardless of whether the laches defense were asserted under federal or state law. Oneida Indian Nation, 691 F.2d at 1084.

106
In asserting its waiver and estoppel defenses, Sherrill contends that the OIN's claim to aboriginal title in the properties is inconsistent with its open-market purchases. As discussed, there is, however, no inconsistency; Indian title and fee simple ownership of reservation land are distinct. We see no reason why a tribe holding both fee simple title and Indian title in a property should be prevented from suing based on the latter. Accordingly, we agree with the lower court's conclusion that Sherrill's proposed amendment to its answer in the Lead case was futile.

VII. Motion to Dismiss the Members Case

107
In the Members case, Sherrill contends that the OIN's officers violated state law by failing to pay property taxes and collect state sales taxes on the Sherrill Properties. Its claims against the officers with regard to property taxes are insufficient for the same reason its counterclaims against the tribe are insufficient: the parcels are not taxable. Sherrill itself acknowledged the possibility of this result in its brief on appeal. See Sherrill Br. at 59 ("If ... this Court reverses the finding of Indian country... then the pleading in the Members Case is sufficient....").

108
Sherrill seeks damages for unjust enrichment arising out of the officers' alleged non-payment of state sales taxes, in particular for goods sold to non-Indians. Compl., Members Case, ¶¶ 25-27, 41-45. While individual tribal officers may be liable for nonpayment of state sales taxes where they act outside the authority of the tribe, see Potawatomi, 498 U.S. at 514, 111 S.Ct. 905 (citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)); Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343, 355, 358-59 (2d Cir.2000), there is no allegation that the OIN's officers — whom Sherrill sued in their official capacities — did so here. Consequently, Sherrill's claim for damages against the OIN's officers is no different from a claim against the tribe itself for non-payment of sales taxes. Accordingly, since the District Court correctly concluded that these officers were immune from suit on the claims related to collection of sales taxes, we affirm the dismissal of the Members case.28

VIII. Motions in the Related Case

109
Madison appeals from (i) the District Court's denial of its motion to dismiss pursuant to Federal Rule of Civil Procedure 19 for failure to add the Wisconsin and Thames Oneidas as plaintiffs in the Related case; and (ii) the District Court's sua sponte award of judgment on the pleadings to the OIN. See Oneida IV, 145 F.Supp.2d at 264; Oneida Indian Nation of N.Y. v. Madison County, 145 F.Supp.2d 268 (N.D.N.Y.2001).

A. Rule 19

110
Reviewing for abuse of discretion, Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 725 (2d Cir.2000), we affirm the lower court's determination that the Wisconsin and Thames Oneidas were not necessary (and hence not indispensable) parties. Federal Rule of Civil Procedure 19(a) provides:

111
A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

112
Should a district court determine that a non-party is necessary but is not able to join him, Rule 19(b) requires it to consider, among other things, "to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties," in determining whether the action must be dismissed.

113
Madison contends that the Wisconsin and Thames Oneidas are necessary and indispensable parties in the Related case because of their involvement in other land claim litigation currently pending in the Northern District of New York. See supra Part II; Oneida IIIa, 199 F.R.D. 61; Oneida IIIb, 194 F.Supp.2d 104. The parties whose interests Madison contends require protection, however, deny they require it. On the contrary, the Wisconsin and Thames Oneidas insist that their interests are aligned with, and adequately protected by, the OIN and they will not be prejudiced if they are not joined. See 6/15/00 Aff. of Arlinda Locklear; 6/23/00 Aff. of Carey R. Ramos (submitted in 00-CV-506). Moreover, the OIN can obtain the requested declaratory and injunctive relief without the other branches as parties. Accordingly, the District Court did not abuse its discretion in determining that the Wisconsin and Thames Oneidas are not necessary, and hence not indispensable, parties. See ConnTech Dev. v. Univ. of Conn. Ed. Props., Inc., 102 F.3d 677, 682 (2d Cir.1996).

B. Judgment on the Pleadings

114
In awarding judgment on the pleadings in the Related case to the OIN, the District Court determined that:

115
[a]ll the facts in the Lead Case likewise apply in this case. Moreover, as Madison County appeared as amicus curiae in the Lead Case, it had a full opportunity to be heard on the taxation issue. Accordingly, based upon the foregoing determination that the properties at issue are Indian Country and therefore not taxable, the Nation is entitled to judgment on the pleadings.

116
Oneida IV, 145 F.Supp.2d at 264.

117
We believe that this sua sponte dismissal of the Related case "on the pleadings" was procedurally improper. Under Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings only "[a]fter the pleadings are closed." Although Madison had moved to dismiss the complaint under Rule 19(a) for failure to join necessary and indispensable parties, it has not answered the complaint. Madison contends that, if it had an opportunity to answer, it would raise defenses distinct from those of Sherrill — although it neglects to articulate those defenses. Further, the sole ground the court provided for its decision to dismiss the case was that "[a]ll the facts in the Lead Case apply in this case." Different parcels, however, are at issue. And although there is some evidence in the record indicating that the Madison properties were part of the Oneidas' historical reservation, this evidence is meager. It may well be that the lower court's instincts on the merits of Madison's claims are correct. But rather than attempt to decide the issue based on an incomplete record, we vacate this portion of the judgment and remand for further proceedings.

CONCLUSION

118
For the foregoing reasons, we affirm: (i) the denial of Sherrill's motion for summary judgment or, in the alternative, for a preliminary injunction based on its counterclaims in the Lead case; (ii) the denial of Sherrill's motion for leave to amend its answer in the Lead case; (iii) the denial of Sherrill's Rule 56(f) motion; (iv) the grant of the OIN's cross-motion for summary judgment in the Lead and Eviction cases; and (v) the grant of the OIN's officers' motion to dismiss the Members case. We vacate the dismissal of the Related case and remand for further proceedings consistent with this opinion.

Notes:

1
Despite our use of the "OIN" acronym, the Oneida Indian Nation of New York should not be confused with the original Oneida Indian Nation, which is not a federally recognized tribe and is not a party to these consolidated cases. As discussedinfra, the original Oneida Indian Nation became divided into three distinct bands, the New York Oneidas, the Wisconsin Oneidas, and the Canadian Oneidas, by the middle of the nineteenth century.

2
Located in Oneida County, Sherrill is the State's smallest city, occupying one-and-one-half square miles with a population of approximately 3000 and an annual budget of $2.4 million

3
It appears that the Sherrill Properties were transferred to an individual OIN member in 1805 and by that member to a non-Indian in 1807, and were thereafter owned by several private parties until their reacquisition

4
Sherrill appeals from the three separate judgments entered by the District Court on June 4, 2001, in the Lead, Eviction and Members Case, considered under docket number 01-7795. Madison appeals from the District Court's entry of judgment in the Related case, as well as the court's order denying its motion to dismiss, considered under docket number 01-7797
On appeal, Madison, Oneida County, and the State of New York have appeared as amici curiae on the Lead, Eviction, and Members cases. They will be referred to collectively as the "amici."

5
Prior to 1794, the Oneidas ceded substantial portions of their aboriginal lands to New York State. In 1785, by the Treaty of Fort Herkimer, the Oneidas ceded approximately 300,000 acres to New York StateOneida Indian Nation of N.Y. v. New York, 860 F.2d 1145, 1148 (2d Cir.1988). In 1788, by the Treaty of Fort Schuyler, the Oneidas ceded approximately 5 million more acres to the State and retained 300,000 acres as a reservation. Oneida II, 470 U.S. at 231, 105 S.Ct. 1245, Oneida IIIb, 194 F.Supp.2d at 112. The Sherrill Properties and, it appears, the Madison properties, were part of the territory reserved to the Oneidas. Oneida IV, 145 F.Supp.2d at 234.

6
Colonel Timothy Pickering, the United States Secretary of War following the Treaty of Canandaigua, upon the recommendation of the United States Attorney General, ordered the Superintendent of the Affairs of the Six Nations not to aid New York in any purchases of Indian land and forwarded to New York Governor George Clinton a copy of the Attorney General's opinion that title to the Six Nations' land could be extinguished only by a treaty entered into under authority of the United StatesSee Seneca Nation of Indians v. New York, 206 F.Supp.2d 448, 494 (W.D.N.Y.2002).

7
Ogden Land Company, which held preemption rights to Indian lands in New York State, wished to free the remaining reservation land in the State from Indian title. Eleazar Williams, an Episcopal lay reader and catechist who had moved to the Oneida reservation, persuaded a large group of Oneidas and members of other tribes to emigrate and assisted in making the arrangements for their removal with the Wisconsin tribes. Francis Paul Prucha,American Indian Treaties 96, 202 (1997) (hereinafter "Prucha"); Campisi at 485. Williams' motive, however, differed from that of the State and Ogden; he sought the "establishment of an Iroquois ecclesiastical empire with himself as its leader ... resettled in the vastness of Wisconsin." Campisi at 485.

8
The purchase was made on behalf of the Six Nations (excluding the Mohawks, who had withdrawn to Canada) and the St. Regis, Stockbridge, and Munsee tribes. The terms of this purchase and another made in 1822 were memorialized in a treaty between the federal government and the Menominee in 1831, to which the New York Indians gave their assent in 1832See New York Indians II, 170 U.S. at 14, 18 S.Ct. 531; Treaty of Buffalo Creek, 7 Stat. 550, Preamble (1838) (proclaimed April 4, 1840).

9
The impetus for the Removal Act was a conflict between Georgia and its Cherokee Indian inhabitants. Georgia, desiring complete jurisdiction over the lands within its territory, had signed a compact with the federal government in 1802 by which the state relinquished its western lands (which ultimately became the states of Mississippi and Alabama) in return for a promise by the United States to extinguish Cherokee Indian title to Georgia lands "as early as the same can be peaceably obtained on reasonable terms." Prucha at 156. When the federal government failed to live up to its part of the bargain, Georgia itself denied the Indians' title and jurisdiction over the lands in question and considered the treaties it had signed with the Indians — which recognized Indian title and political autonomy — invalidId. at 157. These actions led to significant objections by the northern states. After heated debates in Congress concerning Indian rights, in particular the relative sanctity of their treaty-making power, the Indian Removal Act was passed, and the Cherokees' removal from Georgia was complete by 1838. Id. at 161-65.

10
The damages phase of this case has just recently concluded, more than thirty years after the case commenced, with the Oneidas receiving approximately $35,000 plus prejudgment interest from Oneida and Madison CountiesSee Oneida Indian Nation of N.Y. v. County of Oneida, N.Y., 217 F.Supp.2d 292 (N.D.N.Y.2002).

11
Although § 1151 is a criminal statute, it "generally applies as well to questions of civil jurisdiction."DeCoteau v. District County Court, 420 U.S. 425, 428 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). It codified the Act of June 25, 1948, 62 Stat. 757, which was passed to correct jurisdictional conflicts arising from allotment policy and the subsequent restoration of surplus lands to tribal ownership in the Indian Reorganization Act. Hagen v. Utah, 510 U.S. 399, 425, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) (Blackmun, J., dissenting). Its practical effect "was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments." Okla. Tax Comm'n v. Sac & Fox Nation, 508 U.S. 114, 125, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (quotation omitted).

12
TheAlaska Court itself noted that it "had also held, not surprisingly, that Indian reservations were Indian country." 522 U.S. at 528 n. 3, 118 S.Ct. 948; see also id. at 528-30, 118 S.Ct. 948 (discussing cases where the Court had found "that Indian lands that were not reservations could be Indian country" (emphasis added)).

13
Sherrill's argument that the Oneidas' land does not meet federal set aside requirements because it was originally allocated to the Indians by New York State, rather than the United States, is incorrect. The 300,000 acres were a carve-out from the 1788 Treaty of Fort Schuyler, and represented that portion of the Indians' aboriginal homeland that had not been conveyed to New York and thus never became state landOneida II, 470 U.S. at 231, 105 S.Ct. 1245, Oneida IIIb, 194 F.Supp.2d at 139 (noting that Article 2 of the treaty "specifically states that the Oneidas `hold to themselves and their posterity forever' the `reserved lands'"); id. at 140 (concluding that "the Treaty of Fort Schuyler cannot reasonably be understood to have divested the Oneidas of their aboriginal title"). After the federal government assumed complete control over Indian affairs with the ratification of the Constitution, the Canandaigua Treaty recognized the Oneidas' 300,000-acre reservation in federal terms, stating that it "shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." 7 Stat. 45.

14
Section 465 of the 1934 Indian Reorganization Act allowed some of the land alienated under allotment to return to Indian hands. The section "grants the Secretary of the Interior authority to place land in trust, to be held by the federal government for the benefit of the Indians and to be exempt from state and local taxation after assuming such status."Cass County, 524 U.S. at 114, 118 S.Ct. 1904.

15
This canon has been applied on numerous occasions to exempt tribes from state taxationSee, e.g., Bryan v. Itasca County, 426 U.S. 373, 392-93, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); McClanahan, 411 U.S. at 174-75, 93 S.Ct. 1257 (1973); Squire v. Capoeman, 351 U.S. 1, 6-8, 76 S.Ct. 611, 100 L.Ed. 883 (1956); Carpenter v. Shaw, 280 U.S. 363, 366-67, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choate v. Trapp, 224 U.S. 665, 675-79, 32 S.Ct. 565, 56 L.Ed. 941 (1912); The Kansas Indians, 72 U.S. (5 Wall.) 737, 760, 18 L.Ed. 667 (1866).

16
Beginning in the late-nineteenth century, Congress passed a series so-called "surplus land acts," forcing Indians onto individual allotments carved out of reservations and opening unalloted lands to non-Indian settlers

17
Sherrill and the State rely upon Article 2 of the Treaty, asserting that the Oneidas agreed to the Kansas tract "as apermanent home for all the New York Indians, now residing in the State of New York." Buffalo Creek Treaty, Art. 2 (emphasis added). This provision, however, applies only to those Indians "who have no permanent homes." It is therefore not applicable to the OIN, who had a permanent residence in New York State. Even if it were applicable, the article does no more than Article 13 in revealing an intent by Congress or the Oneidas to disestablish their reservation in New York.

18
Contrary to the contention of Sherrill and New York State, consideration of the Gillet declaration here is properSee Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). Senate amendments to the Buffalo Creek Treaty in June 1838 required a federal commissioner to explain its meaning to the tribes before it could take effect. Following Gillet's declaration to the Oneidas, the tribe assented to the treaty, and this assent — which refers to Gillet's declaration and includes his affirmation that the assent was voluntary — appear as addenda to the document as ratified. See New York Indians II, 170 U.S. at 24, 18 S.Ct. 531 ("[A] written declaration annexed to a treaty at the time of its ratification was as obligatory as if the provision had been inserted in the body of the treaty itself.") (citing Doe v. Braden, 57 U.S. (16 How.) 635, 656, 14 L.Ed. 1090 (1853)).

19
This statute gives the courts of New York civil jurisdiction in actions "between Indians" or "between one or more Indians and any other person or persons." 25 U.S.C. § 233 (2000). Notably, it also provides that nothing in it "shall be construed as subjecting the lands within any Indian reservation in the State of New York to taxation for State or local purposes."Id.

20
Most of these documents, in particular those published by the Department of the Interior and the Commissioner of Indian Affairs, appear to rely on one another. And one of them, the Department of the Interior's 1997 Annual Report on Indian land, acknowledges that thirty-two acres in Madison County is under the jurisdiction of the Bureau of Indian Affairs ("BIA"). This is, presumably, the same land we referred to as federally protected land inBoylan. 265 F. at 165-68.
Further, the fact that certain congressional documents and maps of the area, introduced by New York State on appeal, omit mention of an Oneida reservation in New York State does not conclusively indicate disestablishment. In fact, other relatively recent maps and documents, as the amici recognize, do reveal such a reservation.

21
Contrary to the suggestion of Madison and Oneida Counties, the fact that, under the 1843 law, individual Indians could hold the land in common, and could sell it to non-Indians under specified circumstances, does not reflect the disestablishment of the reservation

22
The case against disestablishment is further supported by the text of Article 3, which preserves Indian title to the Kansas lands (by preventing forfeiture of such title) as long as the tribe hasagreed to remove; there is no divestiture requirement or other exchange. The Supreme Court in New York Indians II pointed out that the Oneidas had met the condition to avoid forfeiture merely by their agreement to remove. 170 U.S. at 26, 18 S.Ct. 531. Contrary to the State's suggestion, the Oneidas' agreement to remove is distinguishable from an agreement to cede their reservation; the latter could have occurred as a result of the former, but it never did because the applicable conditions were not satisfied.

23
Nor do any of the authorities listed by the dissent. It is true that some groups of Indians claiming tribal status, which werenot federally recognized tribes, have been required to demonstrate "continuous tribal existence" in order to establish standing under the Nonintercourse Act. See Oneida IIIb, 194 F.Supp.2d at 121 n. 11 (citing Mashpee Tribe v. New Seabury Corp., 592 F.2d 575 (1st Cir. 1979) (Mashpee I), and Canadian St. Regis Band of Mohawk Indians v. State of N.Y., 146 F.Supp.2d 170, 184 (N.D.N.Y.2001)). But Sherrill and Madison have challenged neither the OIN's standing nor its current tribal status. In other cases, when relevant, courts have quite logically noted that tribes can only recover under the Nonintercourse Act if they "were tribes at the time the land was alienated." Mashpee Tribe v. Secretary of the Interior, 820 F.2d 480, 482 (1st Cir.1987) (Mashpee II). But there is no question that the OIN was a tribe and in a trust relationship with the federal government at the time of the conveyances at issue. Neither the dissent nor Sherrill has identified any authority for the proposition that to sustain a claim under the Nonintercourse Act a federally recognized Indian tribe must demonstrate that its tribal structure remained intact continuously after unlawful conveyances of tribal land.

24
Sherrill, citingMashpee II, argues that a temporary lapse of tribal status, however involuntary or unintended, causes "Non-Intercourse Act coverage [to] terminate[]." Sherrill Br. at 44. But Mashpee I makes clear that an "involuntary process of assimilation" is insufficient to constitute abandonment of tribal status, which can only occur voluntarily and willingly. See Mashpee I, 592 F.2d at 587. This requirement underscores the fact that a temporary lapse of tribal organization is insufficient to sever the trust relationship between a federally recognized tribe and the federal government. See The Kansas Indians, 72 U.S. at 757, 72 U.S. 737.

25
These authorities also include a decision of the Northern District of New York,United States v. Elm, 25 F.Cas. 1006, 1008 (N.D.N.Y. 1877), stating that since 1838, the Oneidas' "tribal government ha[d] ceased as to those who remained in this state." However, the decision also suggests continued tribal status, as the Oneidas "continued to designate one of their number as chief," albeit for certain financial tasks, and states that there are "20 families which constitute the remnant of the Oneidas resid[ing] in the vicinity of their original reservation ... their dwellings ... interspersed with the habitations of the whites." Id.

26
Felix Cohen, whom Sherrill also cites, relies on the same source as the 1916 letter, a 1915 memorandum by a lawyer in the Office of Indian Affairs. Cohen at 416-17 n.6 (1942)

27
We also agree with the lower court's conclusion that Sherrill's counterclaims were improper because the tribe is immune from suit in federal courtSee Oneida IV, 145 F.Supp.2d at 258-59; see Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (stating that suits and cross-suits against Indian tribes are barred by tribal sovereign immunity absent a clear waiver by the tribe or congressional abrogation) (citing United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 511-13, 60 S.Ct. 653, 84 L.Ed. 894 (1940)).

28
We need not address the additional ground upon which the District Court found the Members case insufficient, namely, that Sherrill failed to add the OIN as a necessary and indispensable partySee Oneida IV, 145 F.Supp.2d at 263-64.

119
VAN GRAAFEILAND, Senior Circuit Judge, dissenting.

120
I agree with my colleagues that the district court erred in granting judgment on the pleadings against Madison county. However, I disagree with their affirmance of summary judgment against Sherrill in the lead case. Accordingly, I dissent with respect to the court's holdings against Sherrill.

121
In the first paragraph of the majority opinion, we are instructed not to confuse the Oneida Indian Nation of New York, identified in the opinion by the terms "OIN" or "the Oneidas" with the Oneida Indian Nation, "which is not a federally recognized tribe and is not a party to these consolidated cases." The opinion then continues: "The Oneidas lived on what became central New York State long before the founding of the United States." Despite my colleague's admonishment, I assume that Judge Parker uses the word "Oneidas" here to mean the race as a whole, not the Oneida Indian Nation of New York. I see nothing in the record to indicate that the Oneida Indian Nation of New York, which, after all, could not have been in existence before its namesake state, has existed from time immemorial. Although some courts apparently have accepted that aboriginal rights can be inherited somehow by a successor tribe that has no aboriginal rights of its own, I am not persuaded. Moreover, even assuming that aboriginal rights are heritable, I believe that there exists a substantial question as to whether any such rights inherited by the Oneida Indian Nation of New York were forfeited because its tribal existence was abandoned for a discernable period of time.

122
Rather than add another hundred-page opinion to the quagmire that presently exists in this area, I simply offer the following statements from what I believe are authoritative sources:

123
• "The right of Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy.... The possession, when abandoned by the Indians, attaches itself to the fee without further grant." U.S. v. Cook, 19 Wall. 591, 86 U.S. 591, 593, 22 L.Ed. 210 (1873).

124
• "We think it entirely clear that this treaty did not convey a fee simple title to the Indians; that under it no tribe could claim more than a right to continued occupancy; and that when this was abandoned all legal right or interest which both tribe and its members had in the territory came to and end." Williams v. City of Chicago, 242 U.S. 434, 437-38, 37 S.Ct. 142, 61 L.Ed. 414 (1917).

125
• "To establish a prima facie case based on a violation of the [Nonintercourse] Act, a plaintiff must show that ... the trust relationship between the United States and the tribe has not been terminated or abandoned." Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 56 (2d Cir.1994)(emphasis added).

126
• "Certainly individual Indians or portions of tribes may choose to give up tribal status.... If all or nearly all members of a tribe chose to abandon the tribe, then, it follows, the tribe would disappear." Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 587 (1st Cir. 1979) (citations omitted).

127
• "By the treaty the Osages ceded and relinquished to the United States all of that reservation, and in consideration therefor the United States reserved, set apart, what later was known as the Kansas Reservation in which the Indians were given only the right of occupancy so long as they might choose to remain; and as already said they later chose to go elsewhere, which is a surrender and abandonment of the only right given to them by the treaty." Shore v. Shell Petroleum Corp., 60 F.2d 1, 3 (10th Cir. 1932).

128
• "Indian tribes, in the absence of a treaty reservation, have only an occupancy and use title, or right, the fee being in the United States, and when an Indian tribe ceases for any reason, by reduction of population or otherwise, to actually and exclusively occupy and use an area of land clearly established by clear and adequate proof, such land becomes the exclusive property of the United States as public lands, and the Indians lose their right to claim and assert full beneficial interest and ownership to such land[.]" Quapaw Tribe of Indians v. U.S, 128 Ct.Cl. 45, 120 F.Supp. 283, 286 (1954).

129
• "Since original Indian title is dependent upon proof of actual, continuous, and exclusive possession, proof of voluntary abandonment of an area by a tribe constitutes a defense to the aboriginal claim." COHEN FELIX S., FEDERAL INDIAN LAW, Ch. 9, Sec. A2a (1982).

130
• "The right of occupancy and possession is lost by abandonment, and possession, when abandoned by the Indians, attaches itself to the fee without further grant." 42 C.J.S. Indians § 70 (1991).

131
The majority claims that the historical records offered by Sherrill to show that the Oneidas cannot establish continuous tribal existence "merely reflect the opinions of a handful of government officials and commentators[.]" My colleagues' attempts to minimize the significant evidence of tribal dissolution in the record are misleading. Sherrill cites numerous persuasive authorities, most notably contemporaneous reports by both the Commissioner of Indian Affairs and the Department of the Interior, in support of its argument that the tribe ceased to function for a period of time:

132
• "[The Oneida] tribal government has ceased as to those who remained in [New York] state.... [The designated chief's] sole authority consists in representing them in the receipt of an annuity.... They do not constitute a community by themselves, but their dwellings are interspersed with the habitations of the whites. In religion, in customs, in language, in everything but the color of their skins, they are identified with the rest of the population." U.S. v. Elm, 25 F. Cas. 1006, 1008 (N.D.N.Y.1877).

133
• "The Oneida Indians have no reservation.... [The few Oneidas that remain] are capable and thrifty farmers, and travelers passing through the county are unable to distinguish in point of cultivation the Indian farms from those of the whites. The Oneida have no tribal relations, and are without chiefs or other officers." 1891 Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior. (JA 1229).

134
• The 1892 Census map of New York depicts no Oneida reservation. (JA 995).

135
• "The Oneidas have no reservation. Most of that tribe removed to Wisconsin in 1846. The few who remained retained 350 acres of land in Oneida and Madison counties, near the village of Oneida. This land was divided in severalty among them and they were made citizens." 1893 Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior. (JA 1231).

136
• "The Cayuga and Oneida have no reservations. A few families of the latter reside among the whites in Oneida and Madison counties in the vicinity of the Oneida Reservation which was sold and broken up in 1846, when most of the Oneida removed to Wisconsin. What lands they have they own in fee simple, and the Oneida here are voters in the white elections. A considerable number of the Oneida live on the Onondaga Reservation." 1900 Annual Reports of the Department of the Interior. (JA 1234).

137
• "The Oneida have no reservation. Most of the tribe removed to Wisconsin in 1846. A few families are still living in Oneida and Madison counties, near the old Oneida Reservation and near the village of that name. They are citizens of New York and are entitled to vote at white elections.... At one time they owned several hundred acres of land, which they held in severalty, but they have sold most of it, and now have only a few small and scattered pieces." 1901 Annual Reports of the Department of the Interior. (JA 1238-39).

138
• "The New York Oneida have no reservation: in fact can hardly be said to maintain a tribal existence. About 100 of them have `squatted' on the Onondaga Reserve: so many of these have intermarried with the Onondaga as to preclude any probability of their removal.... About 120 of them are carried on the agency rolls as `Oneidas at Oneida' which is somewhat misleading, as in reality this roll is made up of scattered families residing in Oneida, Madison, Livingston, Genesee, Herkimer, and other counties of the State." 1906 Annual Reports of the Department of the Interior. (JA 1241).

139
Ironically, after dismissing these federal authorities out of hand, the majority argues that recognition of the Oneida Indian Nation of New York by the Bureau of Indian Affairs, which is merely the modern day corollary to the Department of the Interior offices responsible for most of the above-cited reports, must end our inquiry into the tribe's continuous tribal existence. I disagree. Our court, in Golden Hill, observed that "tribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act." Id. at 57. We further stated that, "[r]egardless of whether the BIA were to acknowledge Golden Hill as a tribe for purposes of federal benefits, Golden Hill must still turn to the district court for an ultimate judicial determination of its claim under the Nonintercourse Act." Id. at 58. "The two standards overlap, though their application might not always yield identical results." Id. at 59.

140
Moreover, the degree of deference we owe to BIA recognition in this case ought to be carefully measured, not only because prior reports by the Department of the Interior cast doubt on the continual existence of the New York Oneidas, but also because BIA recognition was granted to the Oneida Indian Nation of New York prior to the BIA's creation of the comprehensive regulations set forth in 25 C.F.R. Part 83 in 1978. In describing the BIA tribal recognition process prior to the passage of these regulations, the First Circuit has stated that the BIA "has not historically spent much effort in deciding whether particular groups of people are Indian tribes. By and large no one has disputed the tribal status of Indians with whom the [BIA] has dealt." Mashpee, 592 F.2d at 581. It seems unlikely that the Oneida Indian Nation of New York volunteered to the BIA any evidence that would have weakened its tribal recognition claim, especially when one considers that they apparently were unresponsive to Sherrill's discovery requests on this issue during litigation. Our court ought not to accept reflexively BIA recognition as dispositive of continuous tribal existence when that recognition was granted before the Bureau had adopted its comprehensive criteria and when the record contains such compelling evidence of a period of tribal dissolution.

141
The majority also contends that the issue of the Oneida's tribal existence was satisfactorily resolved by our court in Boylan. However, Boylan was decided nearly six years before the Supreme Court enunciated in U.S. v. Candelaria, 271 U.S. 432, 442, 46 S.Ct. 561, 70 L.Ed. 1023 (1926), the requirements for establishing tribal existence under the Nonintercourse Act. Following Candelaria, an Indian group seeking to prove tribal existence was required to show that it was "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Id. (citation omitted); see also Golden Hill, 39 F.3d at 59. It is far from clear that the Boylan majority would have reached the same conclusion under the Candelaria criteria.

142
With all of the foregoing as background, we now come to the question that constitutes the heart of this appeal: viz. do my colleagues err in granting summary judgment in favor of the tribe? I believe that the question must be answered in the affirmative. The standard for summary judgment bears repeating. The burden is on the moving party to establish that there exists no genuine issue as to any material fact. See Opals On Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 367 (2d Cir.2003); Burtnieks v. City of New York, 716 F.2d 982, 985 (2d Cir.1983); First National Bank of Cincinnati v. Pepper, 454 F.2d 626 (2d Cir.1972). All evidentiary material submitted must be viewed in the light most favorable to, and all inferences must be drawn in favor of, the non-moving party. See United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Opals on Ice, 320 F.3d at 367; Burtnieks, 716 F.2d at 985. Bearing in mind the deference that we owe Sherrill under these standards, summary judgment clearly should not be granted to the plaintiff. The record presents significant, unresolved questions of fact as to whether the Oneida Indian Nation of New York has been in existence continuously over the last century and a half.